Alexander Hodges *vs.* New England Screw Company, et als.

Upon this point we may say, that if it were so, it would become necessary in every case, in order to avoid an attachment, that the property should be taken from the mortgagor's possession, and it is hardly presumable that the mortgagee would return again to his debtor property which, for his own security, he had found necessary to take from him, or, that the legislature intended to provide for any such remote contingency. The statute proceeds upon the presumption that the mortgagor will be in the possession of the property, and suffered by the mortgagee so to remain, after his, the mortgagor's right to redeem has expired ; for the right to attach is made to depend upon the fact, whether or not the mortgagor in possession, has a right at law to redeem.

ALEXANDER HODGES *vs.* NEW ENGLAND SCREW Co. et als.

The directors of a corporation are liable in equity as trustees for a fraudulent breach of trust.

The primary party to sue for such a breach of trust is the corporation ; but, if the corporation refuse to sue or is under the control of the guilty directors, the stockholders may sue in their individual names.

Directors are not personally responsible for a violation of the charter, where such violation resulted from a mistake as to their powers, provided such mistake did not proceed from a want of ordinary care and prudence.

Courts of Equity have no jurisdiction over corporations, as such, at the suit of a stockholder, for a violation of charter.

Where a corporation, without being expressly authorized by their charter took stock as a corporator in another corporation, upon a bill by a stockholder praying a decree of dissolution of the connection between the two corporations by a sale of said stock, the Court held they had no power to grant the relief sought.

THIS was a bill in equity brought by the complainant, a member of the New England Screw Company, against the said Screw Company and Richard Waterman, Samuel Boyd Tobey, Daniel Paine, Henry L. Kendall and Henry Anthony, members and directors of said Company.

The bill sets forth, that at the October Session of the General Assembly, A. D. 1840, a petition was preferred for " a charter of incorporation for the manufacture of wood screws by the aid of new and useful machines," and, at the same session, the petitioners were incorporated by the name of the " New England Screw Company for manufacturing purposes," and clothed with the powers and restrictions usual to such corporations, the members thereof being made personally liable for the corporate debts. In 1845, the plaintiff and the defendants became the sole members of the company and so continued down to the filing of this bill—the plaintiff holding ninety-eight of the five hundred shares into which the stock was divided, at the par value of $100 per share. In 1845, the Company wishing to enlarge their business, obtained an amendment of their charter, increasing their capital to $300,000, and authorizing them to carry on the business of manufacturing and rolling Iron, under the name of the New England Iron Company and under the direction of the officers of the New England Screw Company. Under this charter they erected large Iron Works and carried on the business of manufacturing and rolling Iron, until December, 1847, when it was suspended. At this time they formed the plan of getting up a new corporation and connecting the Screw Company therewith, for manufacturing patent wrought nails. For this purpose they called a meeting

of the directors, on the 23d of August, 1847, at which all were present, except Anthony, and voted to purchase a certain nail machine and patent right, the plaintiff alone dissenting. The purchase was accordingly made for $26,500, and paid out of the Screw Company's funds. On the 9th of November, 1847, a meeting of the directors was called and a proposal in writing submitted : " That whereas the Screw Company were possessed of certain Iron Works, and, also, of a patent right of making improved nails, and had proposed to form a new company with a capital of $300,000, to be divided into six hundred shares of $500 each, for the purpose of manufacturing such nails and carrying on other branches of the Iron Business, under the name of the Providence Iron Company, to be incorporated under the general act relative to manufacturing corporations, passed in 1847 ;" it was therefore proposed that said Screw Company should take two hundred shares of the capital stock of said Iron Company, provided two hundred other shares be subscribed for by other persons, and, also, should sell to said Iron Company the rolling mill estate and patent right at cost, to wit, for the sum of $182,000. And it was voted to subscribe for two hundred shares in the proposed Iron Company on the terms stated in this proposal, which was afterwards done. And the plaintiff avers that at this meeting he proposed a vote that such of the members of the Company, as desired to form and carry on said new Company, should do so on their own individual account, and not on account of the Screw Company, but the meeting refused to adopt the same. At the May Session of the General Assembly, they petitioned for a charter for the new Company. And it appeared in evidence, that this petition was signed by the plaintiff and the defend-

ants, in their individual names, and that the Screw Company did not sign the same, neither was their any intimation in the petition that the stock was to be taken on account of the corporation.    The plaintiff avers that he appeared and remonstrated against the granting of the petition, except upon condition that in case any existing corporation should take stock in the new Company, said stock should be divided amongst its members in proportion to their shares.    The charter was granted as prayed for, and on the 28th of June, 1848, the rolling mill, patent right and nail machines, were conveyed to the Providence Iron Company for $182,000—said Company paying $82,000 in cash and the residue in shares of its stock.    The Iron Company immediately commenced making wrought nails and has since pursued that and other branches of the iron business.

And the bill further charges the defendants with various acts of fraud, to wit : That they took the stock in the Iron Company on account of the Screw Company, before two hundred shares had been *bona fide* subscribed for; that they and the officers concealed important transactions and papers from the plaintiff, and refused him access to the same ; that they paid more than the market price for the rods furnished them by the Iron Company ; that they had violated the by-laws of the Company ; that the business and profits of the Company had been diminished by diverting the time and care of its officers to the concerns of the Iron Company, the officers and agents of one company being likewise officers and agents in the other ; and that they had managed the concerns of the two companies with a view to reduce the value of the plaintiff's stock, in order to force him to sell it to them at a greatly diminished price, and retire from the Company.

All these charges are denied in the answer, and were found by the Court not supported by proof.

The Bill further charges a diversion of the funds and credit of the Screw Company to the uses and purposes of the Iron Company, by loans of the cash, notes, acceptances and endorsements of said Screw Company, to a very large amount from time to time, and that, at the present time, such loans exceeded $100,000, and were daily continued ; and that in consequence of such diversion of the funds of the Screw Company, and of the attention of its directors and agents to the business of the Iron Company, the prosperity of the Company had declined, and the plaintiff was in danger of irreparable loss and injury.

The prayer of the Bill is : That all connection between the two companies be dissolved, at least so far as the plaintiff is concerned ; that the defendants may be compelled to pay the plaintiff his proportion of the purchase money of the rolling mill estate, not paid in money, or that he otherwise be made whole ; that an account be taken of the losses, &c. the plaintiff has sustained ; that his right of access to the books be restored to him, and for general relief, and for an injunction against all further proceedings of the Screw Company in carrying on the Iron Company, and especially in loaning its endorsements.

The answer admitting, for the most part, the allegations in the bill relative to the formation of the different companies, sets forth, that the plaintiff was in 1845, and previously, the agent of the Screw Company, and was chiefly instrumental in engaging it in the business of rolling iron, and in procuring the amendment of the charter for that purpose. That this business proved

disastrous; and that in 1847, finding themselves embarrassed by the liabilities of the Rolling Mill, and with an establishment which cost $155,000 on hand, without employment, they conceived the plan of forming the Providence Iron Company, in order to sell to them their Rolling Mill, and thus disembarrass themselves. That for this purpose they purchased the patent right and nail machine, and that the plaintiff, although he at first objected, yet offered no other plan of relief, and in the end approved of the purchase. The answer denies that the plaintiff ever dissented to the formation of the Iron Company, or remonstrated against the same to the General Assembly, or that he ever spoke of these acts as a violation of the charter, but admits that on the 8th of May, 1848, he proposed a division of the Screw Company's stock in the Iron Company among the members of the Screw Company; which was declined, as the stock was a part of the Company's assets to meet liabilities, and they were still in debt.

And in regard to the loan of the credit of the Screw Company, the answer sets forth, that in consequence of the expense incurred in commencing their business, the Iron Company had to hire money of the Banks, and applied to the Screw Company and other stockholders to endorse their paper, and they had endorsed the paper to such amount as they thought their interest required; that the amount of said paper is between $83,000 and $84,000; that the Company has not loaned its acceptances or cash, except for a short time in adjusting accounts, and it has been repaid when demanded. The answer denies that the Iron Company is involved in debt, or that there is any loss or danger of loss arising from said endorsements. The defendants further state, that

by the sale of the Rolling Mill they materially reduced the Screw Company's liabilities, and that the contingent liabilities they now incur by said endorsements, are less than the actual liabilities they would have incurred if they had continued to carry on the business of manufacturing Iron in said Rolling Mill.

The defendants deny the plaintiff's charges of fraud, and aver that they have done all and every thing for the best interests of the Screw Company and its stockholders according to their best skill and judgment ; that though a corporation, they are liable for all obligations of the Screw Company, as members of a co-partnership are, and consequently they have been more cautious and devoted to the interests of the Screw Company.

Full evidence was put in on both sides upon all the disputed points of the bill and answer, but the grounds taken in the decision of the Court makes a more explicit statement unnecessary.

This case was argued at the last March Term, and continued until the present for advisement.

B. R. CURTIS, COZZENS and BRADLEY, for the plaintiff. AMES and JENCKES, for the defendants.

BRADLEY said, he should consider

1st. What were the powers of the New-England Screw Company.

2d. Whether or not those powers had been exceeded.

3d. Whether the plaintiff had been injured by the excess.

The whole power of a Corporation is derived from and must be expressed in or necessarily implied by its charter.

If the charter uses language, capable of different meanings, it must be construed strictly. (2 Kent, 299.) The

Alexander Hodges *vs.* New-England Screw Company, et als.

burthen of proving the existence of a power is upon the corporation. If there is a doubt, whether it has the power or not, it fails in the proof

The name of the corporation is an implied limitation upon the powers of the corporation. In this case the implications from the name are strengthened by the petition for the charter, in which power was asked to make wood screws.

This power was extended by amendment, to manufacturing and rolling iron under the name of the New-England Iron Company, but the business was limited to be under the control of the officers of the New-England Screw Company.

The chartered powers have been exceeded in this, viz: The corporation has been made a corporator of the Providence Iron Company, and has endorsed the notes of and lent their credit to the Providence Iron Company. They have kept no accounts of the endorsements on the books of the Screw Company, and they have no security for these endorsements. By these means the personal liability of the members of the Screw Company for its corporate debts has been extended to the debts of the Iron Company.

The Iron Company acts under the provisions of the general law in regard to manufacturing companies, so that the plaintiff is liable for the acts of its officers in whose appointment he has no voice.

There is an express provision that the business of manufacturing and rolling iron shall not be carried on, except under the control of the directors of the Screw Company. The Iron Company has its own agents. This is a vital difference, for in one case the plaintiff has a control over the officers—in the other he has none.

The union of the two companies was effected by a vote of the directors, and not by the act of the corporation. This act was not only illegal, but they were aware of its illegality ; and if not, their ignorance is no excuse. That they knew they had no such power, is apparent from the fact that the petition for the Iron Company is signed by them individually, and does not mention that the Screw Company is to become a stockholder.

The terms upon which the incorporation was to be effected, were not complied with. (Here the counsel contended that the subscriptions for the two hundred shares which were to be obtained before the Screw Company took stock in the Iron Company, were not *bona fide* subscriptions, a charge which was made in the bill, but denied in the answer, and not sustained by proof.)

The damage to the plaintiff is an *increased liability,* and a depreciation of the value of his stock, by exposing it to new liabilities.

Another ground of complaint is the purchase of the Nail Machine and Patent Right.

The defendants are liable for these illegal acts. The directors are but agents of the corporation, and if they transcend or abuse their powers, they are as much responsible to their principal as the agents of an individual. (4 Denio 301. Ang. and Ames, 304.) *Robinson vs. Smith,* (3. Paige, 231.) The directors who wilfully abuse their powers are personally liable to make good the loss occasioned thereby. *Cunningham vs. Pell,* (5 Paige, 607.) Directors are liable for a fraudulent breach of trust. *Verplanck vs. Mercantile Insurance Company,* (1 Edwards, 84.) Directors are trustees to the corporators, and are personally responsible for a dereliction of

duty.   *Attorney General vs. Wilson,* (1 Craig & Philip, 1.)   *Nathan vs. Whitlock,* (3 Edwards, 215.)

The stockholders of this company are subjected to a co-partnership liability.   How far one partner can pledge the partnership credit by accommodation endorsements, may be seen in *Laverty vs. Burr & Baldwin,* (1 Wend. 529.)   *Boyd vs. Plumb,* (7 Wend. 310.)   These cases show, when a partner acts out of the scope of the partnership, he does not bind his partner without his assent; and it is for him to prove such assent.   *Sumner vs. Marcy,** shows the illegality of a purchase by one corporation in the stock of another.

If the directors set up the plaintiff's acquiescence in their misconduct, they must prove it.   Inasmuch as their conduct has been unlawful, the burthen of proving anything set up in excuse, is upon them.

JENCKES, (after stating the facts to show that the defendants had acted in good faith, and for the interest of the Screw Company,) contended that the charter of the Screw Company had not been violated.   The powers of corporations are created either by express or implied grant, and the name has nothing to do with them.   This charter gives the largest powers incident to corporations. It merely clothes a co-partnership with corporate powers. The power of purchase and sale is granted without restrictions.   The company has not, in the sale which it made, exceeded its powers; and it might take what it pleased as a consideration of the sale, provided it be for the benefit of the corporation.   The whole question is, whether what has been done was for the benefit of the

* Manuscript Case.   Decided by Woodbury.   Mass. Dist.   Circuit Court, May Term, 1847.

corporation. The case of *Marcy vs. Sumner* is not in point. There a company, incorporated to deal in lumber, with a capital limited to $75,000, took stock in a bank to the value of $168,000, for the purpose of getting control of the bank—a palpable violation of their charter, and accomplished under the repeated protest of the plaintiff.

In regard to the exercise of these incidental powers, it is said in *Hamilton vs. Lycoming Insurance Company*, (5 Barr, 345,) a corporation within its powers may contract pretty much like an individual ; and in *Bates & Hines vs. Bank of Alabama*, (2 Alabama, 451) "every corporation, unless expressly forbidden, has power to do acts necessary to its existence, or to the advantageous carrying on of its business." In *Bennington Iron Company vs. Rutherford*, (3 Harrison, 475,) the Court held that the corporation had a right to purchase a bond unless restrained by a prohibitory clause. See, also, *Mott vs. Hicks*, (1 Cowen, 513.) *Moss vs. Ronie Lead Mining Company*, (5 Hill, 137-140.) *Indiana vs. Moran*, (Hill, 33.) *Mann vs. Commission Company*, (15 Johns. 44.) *Silver Lake Bank vs. North*, (4 Johns. Ch. R. 370.) *Baird vs. Bank of Washington*, (11 S. & R. 411.) *Seagrave vs. Hillegan*, (7 S. & R. 313.) *The Banks vs. Poitiaux*, (3 Randolph, 136.) *The Penn. Iron Company, ex parte*, (7 Cowen, 540.) *Alexandria Canal Company vs. Swan*, (5 Howard. Sup. C. R. 89.) *Tripp vs. Swanzey Company*, (13 Pick. 291.) *Hayward vs. Pilgrim Society*, (21. Pick, 276.) *Barry vs. Merch. Ex. Co.* (1 Sand. 280.) These authorities all show that when a corporation is acting in good faith and makes a contract, though not authorized by the charter, and even

against a restraining clause, it will be sustained. Any corporation has power to sell or assign. These powers we have used, and they are within the letter of the charter. (Ang. & Ames, 115 to 124.)

In loaning the credit of the Screw Company to the Iron Company, the directors were also acting within their powers. The power of loaning the credit of the Company follows naturally from the power of sale, provided it be for the good of the corporation.

In order to induce the Court to grant an injunction, the plaintiff must make out a case of irreparable loss or imminent danger, which he has failed to do.

But what is the position of the parties to this bill? A stockholder brings his bill against the directors for mismanagement of the business of a corporation, in which they have the greatest interest, being the owners of four-fifths of the stock, and being themselves personally liable for the losses. He complains of sundry wrongs and of a violation of the charter. For the causes alleged, he cannot sue the corportion. Courts of Equity have no jurisdiction over corporations as such ; they cannot control their action or punish their excesses of power. Neither has the plaintiff any action against the directors in his own behalf merely. If he has any standing, it is in his right to be substituted to the equities of the corporation. The jurisdiction of a Court of Chancery over corporations and their officers, is confined solely to their capacity as trustees. Any violation of their duty in this respect, may be corrected in this Court. But the wrong if it has been done, must be á wrong to the Corporation and through that to the plaintiff. The plaintiff should have brought the action in the name of the Company, but not having power to do this, he makes it defendant. He

Aloxander Hodges *vs.* New England Screw Company, et als.

must work out his remedy through the equities of the Corporation. *Charitable Corporation vs. Sutton,* (2 Atkins, 400.) *Attorney General vs. Wilson,* (1 Craig & Philips 1.) *The Attorney General vs. Utica Insurance Company,* (2 Johns. Ch. R. 371.) *Robinson vs. Smith,* (3 Paige, 222.) *Cunningham vs. Pell & others,* (5 Paige, 607.) *Forbes vs. Whitlock,* (3 Edwards, 146.)

There is no remedy at law in favor of a member against a corporation, even for a wilful and fraudulent violation of trust. *Harman vs. Tappenden,* (1 East. 555.) *Vose vs. Grant,* (15 Mass. 505.) *Franklin Insurance Company vs. Jenkins,* (3 Wendell, 130.) *Taylor vs. Ashton,* (11 M. & W. 400.) *Smith vs. Hurd,* (12 Met. 37.)

The remedy which is afforded in equity is stated in *Scott vs. Depeyster,* (1 Edwards, 513.) The sole question is, whether the directors have or have not bestowed proper diligence. They are liable only for ordinary care ; such care as prudent men take in their own affairs. (Dig. of 1848, p. 465.) It has been decided that directors are not liable for innocent mistakes of law. *Mozley vs. Ashton,* (19 Eng. Ch. R. 790.) Nor would such a mistake work a forfeiture when complained of on the part of the State, (Ang. & Ames, 745.) *Bank Commissioners vs. Bank of Buffalo,* (6 Paige, 497.)

In this case as the directors are managing their own affairs, in a concern in which the plaintiff has but a small interest, they would as a matter of common sense act prudently and bring themselves within the rule.

AMES. Courts of Equity have no power over corporations for an abuse of their charters affecting the public for the purpose of forfeiture. And, even though a charter be forfeited in fact, yet this forfeiture cannot be urged

in a case between an individual and the corporation. Therefore, in this case, considerations of public injury or public benefit can have no place.

This bill is filed by the plaintiff as *cestui que trust*, against the defendants, as trustees, and, accordingly, the rules of law to which courts subject trustees, are the only rules to which the court will subject the defendants. The counsel has read to show that they are agents. They are agents for the corporation, but their relation to the plaintiff is that of trustees. In considering their powers and rights you will regard them as agents; but when you seek what remedy to apply, you will subject them to the law in regard to trustees for a mismanagement of trust· The rules, by which the trustee is made responsible to the *cestui que trust*, vary with the nature and circumstances of the trust, his interest in or connexion with it, the power of the trustee and his motives and design in the administration of the trust. The trust in this case, and the relief sought, are both of a peculiar character; and the circumstances will have great influence in deciding the kind of relief afforded. In the case of a pure trust, the whole legal interest is in the trustee; the whole beneficial interest in the *cestui que trust*. But here the legal interest is in the corporation, the beneficial interest is four-fifths in the defendants, and one-fifth in the plaintiff: so that the defendants are administering a trust which they have the greatest interest in administering prudently. But for the fractional interest of the complainant, this dispute would be one between shadow and substance, between the corporation and those who own all the property in the corporation. The principle by which these corporators are liable, is the principle by which they would be liable to the corporation. Every

decree must be for the corporation.  In looking at their powers · they must be regarded as the majority of the managing board, to whose discretion the interests of the corporation were intrusted.  They are bound to give their most prudent care, which if they neglect, they neglect their duty.  They cannot remain idle, but must act, and according to their own views, not according to the plaintiff's, managing the affairs of the corporation as they would manage their own.  What other rule can they have?  They are not lawyers—they cannot construe words of doubtful legal meaning.  They should not, therefore, be liable for innocent mistakes, unintentional negligence, honest errors of judgment,—but only for wilful fraud or neglect, and want of ordinary knowledge and care.  A stricter rule would deprive corporations of their directors.  I was, therefore, surprised to hear it asserted, that ignorance excuses no man.  Ignorance does excuse, unless it be that palpable ignorance which shows an incapacity for the transaction of ordinary business.  In every case cited, there was fraudulent breach of trust; the trustees were seeking their own profit.  On this subject there is a beautiful consistency in the authorities.  For while on one hand the corporation is responsible to the public, on the other hand the directors are responsible to the corporation, for violations of the charter.  And as it is not every excess of power, that will forfeit the charter to the public, unless wilful and fraudulent, so it is not every excess of power that will render the directors responsible to the corporation.  The courts make a distinction between the mere executive agent of a corporation, who acts under strict rules, and directors, vested with discretionary powers, and bound to act for the best interests of the corporation—

bound to go on, and, therefore, excusable, if they do go on erroneously, but in good faith.

In order to maintain his bill, the plaintiff must prove two facts.

1st. That the directors have been guilty of a fraudulent abuse of trust, or such want of ordinary care and knowledge as will amount to a breach of trust.

2d. As the Court is not here to correct the corporation for an abuse of its powers, he must prove that he has sustained an actual loss, in consequence of this misconduct, in order to entitle him to an account, and he must prove actual danger of loss, if he would have an injunction ; and he must, moreover, show that the injunction will do more good to the corporation than harm, inasmuch as he sues in the right of the corporation.

Has such a case been made out as will entitle the plaintiff to the redress asked for ?

The first breach of trust charged, is the purchase of the patent and the building of nail machines.

The purchase was no excess of power. They had, under their power of purchase and sale, the right of purchasing this machine to attach to their property, in order to sell it at cost. And it was for this purpose that the patent was bought. Besides the plaintiff did not object to the purchase as an excess of power, but because he thought the mill would sell better without it, and afterwards confessed his mistake.

The next subject of complaint, is the getting up of the Providence Iron Company, the selling the mill to the new corporation, taking $100,000 worth of stock, and the fictitious character of the subscriptions.

The main breach of trust alleged is, that, in part payment for the rolling mill, they have taken stock in the

Iron Company to the amount of $100,000. This is grounded upon what was called a general law, that a corporation cannot subscribe for stocks in another corporation. We deny that this is the law. You cannot say as a general rule that a corporation cannot do anything, not expressly prohibited in its charter. It depends upon circumstances, and whether it will serve the purposes for which it was incorporated.

In one of the cases cited, it is said that a corporation has all the powers of an individual, unless restricted by the words of its charter, or by necessary implication. The difference between a corporation and an individual is, that a corporation is one-sided, created for special purposes, while an individual is many-sided ; but in carrying into effect the purposes for which it is created, a corporation has all the powers of an individual. The members of a corporation are incorporated that they may have greater efficiency ; but, if you impose the restrictions contended for here, you will subvert the object of its creation.

Apply the proposition to other cases. Cannot an Insurance Company invest its premiums in stock, without a provision in its charter authorizing it ? Do not our charitable and literary corporations have a right to purchase and hold stock ? It might be said that a college is instituted to instruct youth, and not to purchase stock. Yet under its power to hold personal and real property, it has this right, and has it as an incident to its main purpose.

In this case the investment in the stocks of the Iron Company was not foreign to the purposes of its creation. One principal ground taken by Judge Woodbury in the case of *Sumner vs. Marcy* was, that a corporation, cre-

Alexander Hodges *vs.* New England Screw Company, et als.

ated to deal in lumber, by taking stock in the bank in order to get control of it, was engaging in business foreign to the purposes of its charter.

It is complained that the name of the Screw Company was not appended to the petition for the charter of the Iron Company. But why visit this fault upon the other directors more than upon Hodges, who was equally guilty of it ?

The liability is said to be different in the Iron Company from what it is in the Screw Company. If it is different, it is more favorable. But it is objected, that the debts of the Iron Company may be visited upon the members of the Screw Company individually. The members of the Screw Company are liable for the debts of the Screw Company ; but the debts of the Iron Company can be collected only against the Iron Company. But the plaintiff seems to think he may be responsible by the power of the corporation to assess the stockholders. The value of the share is limited, and the calls upon the stockholders by assessment is limited by the amount of its stock.

That it was no breach of trust, is plain from the fact, that they were not only enabled to dispose of the Iron Mill, but to shift off the responsibility of the business.

But his complaint is not that the defendants bought into the Iron Company with corporate funds, but that they would not issue the stock among the corporators. This would have raised two questions : first, as to their right to take the stock, and, second, to divide among stockholders stock purchased with corporate funds, and pledged for corporate liabilities. The stock was held to enable them to meet their liabilities.

Alexander Hodges *vs.* New-England Screw Company, et als.

He is, moreover, estopped from recovering by his own acts, having participated in or ratified the essential acts of which he complains.

In the purchase and holding of this stock, there has been, therefore, no breach of trust, but a benefit to the corporation, and, consequently, to the complainant.

A further subject of complaint, are the endorsements. This subject has been treated, as if it presented the naked question, whether one corporation could lend its credit by endorsement or guaranty to another, in which it had no interest. We grant, that it cannot merely for the pleasure of the other. But within the line of its business the power of a corporation to make contracts, and make and endorse notes, is unrestricted. A corporation can do it as well as an individual, if they do it to advance their own business.

The prayer of the bill is, that the connection between the two corporations may be dissolved, at least, so far as the orator is concerned. But how can the Court annul the contract between the companies. The Iron Company is not made a party to the bill. You may order a sale of the stock in the Iron Company—but when and how. You must consider the interests of the Screw Company. You must not under the pretence of relieving the corporation, make its situation worse. Seeking the good of the corporation, you will leave its interests where the law has reposed them, in the discretion of the directors. If you should tell them to sell, as soon as a sale would be advantageous, that is what they intend to do.

He further asks you to compel the defendants to pay him his proportion—to compel a dividend. You have no such power, unless there is a clause in the charter requiring a dividend, and then, the more appropriate remedy

would be by *mandamus.* What is to become of the debts ? You might ruin the corporation through which he asks this.

He also asks an injunction upon further endorsements. If any relief is given, it must be given out of deference to the interests of the corporation. Would an injunction be for its interest ? If the directors endanger the corporation they endanger themselves. They own the largest share of the stock and are liable in their persons and in their property.

B. R. CURTIS, in reply. I shall contend *first,* that the execution of the plan formed by the defendants in August, 1847, taken as a whole, transcended the powers of the corporation.

That it should be looked at as a whole is evident, because it was formed and executed as such, and because it has been regarded as such on both sides. This plan was to purchase a patent right for $25,000, to get up a new company and to become permanently connected with it by taking stock in it to the amount of $100,000, and thus to embark in a new, untried, and highly speculative business. These facts are admitted.

Now, did the execution of this plan exceed the powers of the corporation ? The construction of the charter is unimportant. The Company was incorporated as a Screw Company, and it seems to be a pretty reasonable inference that it was designed to make screws. But I consider this unimportant because the charter was afterwards modified by an amendment, in which their powers are pretty clearly indicated. The substance of the amendment was, that they might increase their capital to $300,000, and manufacture iron under the name of

the New-England Iron Company—but all the time being one corporation and one set of officers. In May, 1847, the Legislature created a corporation called the Providence Iron Company. We look in vain into this new charter to discover any connection between the Providence Iron Company and the New England Screw Company. The Providence Iron Company being incorporated, the Screw Company takes stock to the amount of $100,000. It was then carrying on the manufacture of iron in a way which the Legislature did not authorize in amending its charter.

Now, how does this agree with their charter ? Their charter authorizes them to manufacture and roll iron—but in the name of the New England Screw Company. Are they doing business in the name of the New England Screw Company ?. They are authorized to increase *their* capital stock to the amount of $300,000. Did they when they put $100,000 into the Iron Company increase *their* or the Iron Company's stock ? It also authorized the carrying on the business under the direction of the officers of the Screw Company. Was this form or substance ? The directors of the Screw Company were chosen in a manner in which the plaintiff had a voice and could make them accountable to himself. Was not this a total departure—not in form but in substance— from their authorized charter powers ?

But taking a wider view. This is a corporation authorized to carry on a certain manufacture. The Court will find, from the statement which will be made, that instead of being in the involved state which was represented, it had a capital of $156,000 over its liabilities. To carry on the business, in which they embark, they need every ninety days $115,000 worth of coal. This,

in itself, is an exercise by the directors of a large and extensive power. To take stock in a company thus got up, is an important power. We ask then where they got this power? We say that they have embarked this capital in this new business, under a new set of by-laws, in forming which, we have no voice and under the direction of officers unaccountable to us, and where do they find their power? They say, in their power of sale. It is said that this purchase of stock was in payment for the property of the New England Iron Company. But, whatever it was in reality, it was in point of form a subscription. They say that under the power of sale they have the power to fix the price ; but under the guise of fixing the price they cannot acquire a totally new power. They cannot fix the price as a cargo of Guinea slaves, or a steamboat with intent to run it. Then there are some limitations. Where do you fix these limitations? There must be some rule. It cannot be that the whole subject is left in the discretion of the directors. They are accountable ; and can it be that the law has left them to grope in darkness at the same time that it has made them accountable? The rule which the defendant's counsel propound is, that a corporation may do just what an individual may do in the same business. That is unlimited power. An individual is acting in his own right, not as an agent with a delegated or limited power. The defendants are to act as agents having a limited power, the mode of exercising which, is not pointed out. They must act as other agents do, conduct their business in a *usual* and fit manner ; but it must be usual as well as fit. The remark of Judge Story is, that where the means are *usual* and appropriate, there is an implied power. Now, an individual is not bound by usage ; he may do

what he pleases. The determination of what is usual, affords a rule for the solution of this question. It is asked if it is not usual for corporations to take stock in other corporations. Yes—but you must look to all the circumstances. I agree that an Insurance Company may subscribe for stock, because it is in the line of its business. But a manufacturing corporation is to hold its stock to do its own business—not to invest in that of others. The Legislature limits the amount of capital of a manufacturing corporation because they expect them to employ it in their own business.

This is a corporation of a peculiar character, its members being personally liable. I know of no better definition for it than that it is a partnership clothed with corporate powers. The only difference is in point of form. In one case, they choose a name and elect their directors by agreement. In the other, the name is given and the mode of electing officers prescribed,—but when engaged in business they are the same. Have the incidents which have been pointed out to distinguish it from a partnership any existence ? It has been said that in a corporation the individual is merged, but this is not so where he has an individual liability. It has been said that a partnership cannot refer to arbitration ; but it can if the manager is vested with complete control. Now, suppose that this is a partnership, with certain directors, and you are a member ; you go away, and when you return you are served with an execution and informed that during your absence, the partnership has gone into a new concern and incurred debts for which you are taken. You ask how they could subject you to these liabilities. They say by the power of sale ; did you not give power to sell ? Yes—but not to sell out of the usual way.

The whole argument upon the other side upon the implied power is a perversion of the settled rules of law. What is the nature of these implied powers ? Are they not implied for the purpose of carrying into effect powers which are expressed ; not under their implications to authorize the directors to embark the corporation in an entirely new business ? This charter says : " to do and execute all matters and things which are necessary to carry into effect the powers and privileges herein granted"—no unlimited power.

*Second.* How and why was this a violation of the charter? Wherein was the violation—in every step or in some particular step in this plan ? It was not in purchasing the patent right as a separate thing, because it is shown that the plaintiff changed his views upon that. Was it in selling the rolling mill ? Certainly not. Was it in getting up a company to purchase this property ? No—there was nothing illegal in that. Was it in agreeing that they would put in $100,000 in the new Company ? I think this would transcend their powers ; but I am not obliged to maintain that. What then is our case ? It is that, from the begining, they intended to embark and continue the Screw Company in this business. It is upon this ground that we complain that the charter is violated. The violation was in the whole plan. It has been put before the Court as if it was a mere difference of opinion between them and the plaintiff, whether they should take their pay in this way or another. This is not the case ; and we ask, for our relief, that the union of the two corporations may be dissolved, and that they should be restrained from giving the endorsements of the Screw Company to the Iron Company.

What do they say to justify this plan, and to show that it was no excess of their power ? First, they plead the necessity of holding this property for its debts. Hodges, they say, made a monstrous demand to have the property divided among the stockholders. But the state-ment will show *that this excuse is unfounded.* When they limit their capital nominally to $65,000, they have no right to keep this enormous surplus. There was a real propriety in distributing it. Their real capital ought to correspond somewhat with the nominal. The expe-diencies and the proprieties of the case require a distri-bution. But how is holding the stock going to help them out of debt ? Of all the stock in the world, which any one should hold to relieve himself from debt, this is the most extraordinary. It was constantly embarrassing them. And wholly independent of this stock, they had ample means to meet their engagements. Besides, a cor-poration cannot plead necessity for breaking the law— cannot say, true we broke the law, but made a saving by it.

But they say the plaintiff is estopped by his own acts from obtaining the relief for which he prays : that is, the dissolution of the union of these two corporations. Can he, by any acts or assent, preclude himself from complaining of a breach of trust ?

If the directors urge this defence, they must prove it ; but so far from their proving his assent, he has affirma-tively proved his dissent.

I have not before adverted to the personal liability of these defendants, because I consider this relates to the question of remedy. We ask for a dissolution of this union. This can be done only by a sale of the stock. If there are any necessities or any expediencies for lend-

ing the credit of the Screw Company, we desire that these necessities, and these expediencies, may be put an end to. In making this distribution there will be a loss. And it will be necessary to ascertain who shall bear the loss and what the loss is. To ascertain the loss, it will be necessary to refer the price realized by the sale to some standard. That standard should be the par value of the stock. The court will either refer this matter to a master, or determine it themselves. They can determine it as well as a master—having all the evidence which a master could have. The standard is par.

But there is a different question from that of the extent of the liabilities; which is the question, whether the defendants are liable at all? I insist that they are liable. They cannot say that they acted *bona fide*, and were under a mistake in construing their powers, if they transcended them, because they have made no averments of mistake. The bill states a palpable violation of their charter. They answer, that they acted as they thought best for all concerned. That might well be, when at the same time they knew they were transcending the limits of their powers. But there is evidence that they knew they acted illegally. Why, when they petitioned to be incorporated, did they not put the name of the corporation, as a corporator, to the petition?

The counsel for the defendants has assumed a standard by which to measure the responsibilities of directors at variance with the rule at law. He says a director is liable only for wilful fraud, or for such gross negligence as amounts to fraud. He says that all the cases which we have cited, are cases of fraud. If so, they shed no light on this question. But because the cases cited are cases of fraud, it does not follow that all cases of respon-

sibility are cases of fraud.   What is the rule ?   Within
the line of his powers the director is justified, if he ex-
ercises ordinary discretion.   But if he goes beyond this
line, the rule is different.   Suppose an agent attempts to
bind the corporation in a matter beyond its powers, does
he bind it acting innocently ?   He binds himself and not
the corporation.   The rule laid down in *Scott vs. De-
peyster*, is that a] director is liable only for ordinary care
and prudence.   But this was to apply to a director acting
within the scope of his authority.   The case in *Alabama*
is still stronger.   In that case the charter prohibited the
corporation from paying any compensation to its direc-
tors.   The directors were held liable for paying a direc-
tor for extra services; yet, I do not see why such ser-
vices, rendered unofficially, should not be paid for as
much as if rendered by any other person.

Another branch of the remedy sought, is an injunc-
tion restraining the directors from lending the credit of
the Company.   The argument against this is, that the
Screw Company is so connected with the Iron Company
that it is a duty of self-preservation to endorse the Iron
Company's notes.   If this is so, it is an additional reason
why the connection should not have been formed.   It is
further said that the plaintiff has no claim to relief, save
through the corporation, and if it is for the good of the
corporation to have these endorsements, he cannot com-
plain.   I do not assent to this doctrine.   Hodges is indi-
vidually liable on these notes, and if he has duties under
the charter, he has also rights, and one of his rights is
not to have its name used in this unauthorized way,
binding him personally.   If this was an ordinary corpo-
ration, without the personal liability of the members, the
case would be different.   Nor is the argument that he is

bound by a vote of the majority, any bar to his claim. This is true where the majority has the power to bind him, but not where it exceeds its power.

After the argument, the Court having requested the counsel to submit further authorities as to the jurisdiction of the Court over corporations, as such, at the suit of a stockholder:

B. R. Curtis and Bradley, submitted for the plaintiff,

First. That the directors of a corporation have control over its funds for the purposes authorized by charter, and for no other. And if they apply the funds for other purposes, they are guilty of a breach of trust, over which Courts of Equity have jurisdiction.

Secondly. When the corporation is in the control of the directors, who have committed the alleged breach of trust, a stockholder may bring his bill against them and make the corporation a party. *Robinson vs. Smith*, (3 Paige, 231 and 232. Ang. and Ames, p. 305.) *Bayless vs. Orne, et als.*, (1 Miss. (Freeman's,) pages 174 and 175.)

Third. The decision in *Solomons vs. Laing*, (London Jurist for April, 1850, and for June, 1850,) completely covers the present case, and establishes the right of Courts of Equity to grant the relief asked in the bill. See also *Arnold vs. Ruggles.* (See Supra, p. 165.) *Taylor vs. Salmon*, (4 Mylne and Craig, 141.) *Webb vs. The Manchester and Leeds Railway Company*, (4 Mylne and Craig, 120.)

Jenckes, for the defendants, admitted that the directors were liable for a fraudulent breach of trust, and contended that they alone, and not the corporation, were liable ; that the cases cited from the London Jurist went

no farther to establish the jurisdiction of the court over corporations than the American cases; that the corporation was undoubtedly a necessary party to such a suit, for if any relief was granted, the decree must give it to the corporation, through which the individual corporators must work out their rights and equities; that the decision in the Jurist for June, 1850, if it proved anything, proved too much, since according to that decision the Providence Iron Company should have been made a party, as well as the Screw Company.

GREENE, C. J.    There are some questions raised in the present suit, which we find no difficulty in deciding.

We think the directors of the Screw Company are liable in equity, as trustees, for a fraudulent breach of trust.    The jurisdiction of a Court of Equity over such a case was affirmed by Lord Hardwicke in the case of *The Charitable Corporation vs. Sulton and others*, (2 Atkins, 404,) in 1742, and has been exercised both in England and in this country ever since.    In the case of the *Attorney General vs. Utica Insurance Company*, (2 Johns. Ch. Rep. 359,) Chancellor Kent recognizes the jurisdiction as well settled.    In *Robinson and others vs. Smith and others*, (3 Paige 222,) and in *Cunningham vs. Pell and others*, (5 Paige 607,) the same doctrine is affirmed and acted on.    So also by Vice Chancellor McCoun, in *Verplanck vs. Mercantile Insurance Company*, (1 Edwards 84.)    The cases on this point are so numerous, that we deem any farther reference unnecessary.

The primary party, to sue for such fraudulent breach of trust, is the corporation; because the corporation is the party injured.    *Robinson and others vs. Smith and others*, (3 Paige 222.)    But if the corporation refuse to

sue, the stockholders may sue in their individual names. So if the corporation be under the control of the guilty directors, the stockholders may sue. (3 Paige 222. Ang. & Ames on Corp., 304, 305.)

In the present case, the defendants, who are charged with the fraudulent breach of trust, are the directors of the corporation, and control its action. We think, therefore, that the present bill, so far as it seeks a remedy against directors, comes within the settled jurisdiction of the Court, and that the plaintiff, under the circumstances, is the proper party to sue.

The main question in the case remains to be considered. Has the plaintiff proved the charges in his bill?

The Bill sets forth in detail charges of gross fraud and breach of trust by the directors, and a violation of the charter by the Screw Company; and, if these charges are true, the defendants are justly answerable to this Court for all the damages which the plaintiff has sustained.

In considering this part of the case, two questions arise. *First.* Did the directors commit the acts complained of, and, if they did, were these acts done with the fraudulent design charged? Let us examine the facts.

In 1845, the Screw Company were desirous of enlarging their business, and obtained an amendment of their charter, under which they erected a rolling mill, and carried on the business of rolling iron; and, afterwards, finding this unprofitable, went into the business of making railroad iron, and carried on that business until it ceased to be profitable, which was in the latter part of the year 1847. The business was then suspended.

The rolling mill establishment was then without employment. It had cost $155,000, and was discredited in the market by the unprofitable business which had been carried on there. In erecting the rolling mill establishment, and in carrying on the business there, the Screw Company had incurred a heavy debt. Under these circumstances, the directors of the Screw Company formed the plan of purchasing the nail machine and patent for making wrought nails, and of forming a new company, who were to become the purchasers of the rolling mill and works, and patent and nail machine, and to carry on the business of making wrought nails. The Screw Company were to sell their nail machine and patent, and rolling mill, to the new company at cost, being $182,000, and to receive $82,000 in money, and the balance, being $100,000, in the stock of the new company. The whole capital of the new company was to be $300,000, to be divided into six hundred shares of five hundred dollars each, of which the Screw Company were to take two hundred shares, provided two hundred shares were taken by others, and the company organized in three months.

One great object of the directors, in making this arrangement, was to effect a sale of their rolling mill upon advantageous terms, and to realize from the sale, in order partially, at least, to relieve themselves from debt.

Another object was the anticipated profits of the new business.

The immediate effect of the arrangement was, that the Screw Company received $82,000 in cash, for their rolling mill and nail machine and patent, and still retained, as a stockholder in the Iron Company, one-third of the same property, the other subscribers to the Iron Company putting their money against the rolling mill of the Screw Company, at cost.

The plaintiff, although he objected to the purchase of the nail patent and machine, in the first instance, yet afterwards acquiesced in and approved of the measure. And the evidence shows, the directors had strong reasons to believe the purchase an advantageous one. Neither did the plaintiff object to the new company and to the taking stock therein by the Screw Company, but he wished the stock, when taken by the Screw Company, to be divided among the stockholders, and he was not willing that the stock should be taken, except upon these terms.

This conduct of the plaintiff shows, he considered the plan of the directors a judicious one, and for the interest of the Screw Company, for whether the stock were held by the Screw Company, as such, or by the stockholders of that company individually, the business and profits of the Iron Company would be the same.

The answer states, the result of the formation of the Iron Company and the sale of the rolling mill, has been to diminish the liabilities of the Screw Company to the amount of $15,000, below what they would otherwise have been.

Viewing the plan of the directors, therefore, as a mere business arrangement, and aside from the question of power under the charter, we think it was judicious, and for the interest of the Screw Company. Certainly, we cannot say, they acted without ordinary care and discretion, and, least of all, that they had in view the fraudulent design of reducing the value of the plaintiff's stock in the Screw Company, in order to purchase it at their own price. And we are the more confirmed in this conclusion, when we recollect that the directors owned a large majority of the capital stock of the Screw Compa-

ny, and could not reduce the plaintiff's stock, without at the same time, and in the same proportion, reducing the value of their own.

The reason given by the directors for not dividing the stock in the Iron Company among the stockholders of the Screw Company, in conformity to the wishes of the plaintiff is, that the Screw Company had incurred a heavy debt by the erection of a rolling mill and the business carried on there, and they thought the consideration received for the sale ought to be held for the payment of that debt.

We do not see any thing unreasonable or improvident in this—certainly nothing to sustain the charge of fraud, imputed in the plaintiff's bill. It does not appear that the directors sought or secured to themselves any benefit or advantage, which was not common to all the other stockholders in the Screw Company.*

The bill charges the defendants with lending the endorsements of the Screw Company to the Iron Company. The answer gives the following account of this matter: That the Iron Company have not been able to complete and put in operation their machinery and works as soon as they expected: that in anticipation of having their works in operation at an earlier period, the Iron Company purchased a stock of coal and iron, proportioned to the full capacity of their works, and owing to the delay in getting them in operation, the notes given for the same became due, before the stock could be manufactured and put in market: that in order to meet the

---

* Various charges of fraud set forth in the bill, were here considered by the Court, and found to be unsustained by proof; but as they involved the discussion of no questions of law, they have been omitted in the report.

accruing liabilities, the Iron Company were obliged to borrow money from the banks, and, as the rules of the banks require an endorser, the Iron Company applied to the Screw Company, and to the other stockholders to endorse their paper for the above purpose. This endorsement of the paper of the Iron Company by the Screw Company, was considered by the directors as for the interest of the Screw Company, that company owning so large an amount of the stock in the Iron Company, and being so largely interested in the success of its business.

The directors were individually liable upon the endorsements, as stockholders in the Screw Company, and to a much larger amount than the plaintiff. The other stockholders in the Iron Company took the same view of their interest in this particular, and endorsed the paper of the Iron Company to an amount corresponding to their interest in the stock.

If the stock taken by the Screw Company had been divided among the stockholders, we may fairly presume they would, individually, have endorsed the paper, which has now been endorsed by the Screw Company.

In relation to these endorsements, we may say as we have said of the notes of the Screw Company, that it is not a question of power, but of good faith and sound discretion on the part of the directors. We think the directors have acted in this matter in good faith, and with sound discretion.

Another question remains to be considered, and that is, are the directors personally liable for taking stock in the Iron Company, not upon the ground of any fraud in fact, on their part, but upon the ground that they violated the charter of the Screw Company, in so doing ? In the view we take of the facts upon this part of the case,

it is not necessary for us definitely to decide, whether the act under the circumstances, was a violation of the charter of the Screw Company ; for, although the charter may have been violated, still, we do not think the directors ought to be personally responsible under the circumstances. We prefer to decide so important a question, upon a proceeding against the corporation, when that is the question directly put in issue. In considering the question of the personal responsibility of the directors, therefore, we shall assume that they violated the charter of the Screw Cempany. The question then will be, was such violation the result of mistake, as to their powers, and if so, did they fall into this make from want of proper care, such care as a man of ordinary prudence practices in his own affairs. For, if the mistake be such as with proper care might have been avoided, they ought to be liable. If, on the other hand, the mistake be such as the directors might well make, notwithstanding the exercise of proper care, and if they acted in good faith and for the benefit of the Screw Company, they ought not to be liable.

It was contended by the counsel for the plaintiff, that the ground of innocent mistake could not avail the defendants, because they had not set it up in their answer. But the answer does allege that the directors, in all they have done in managing the affairs of the Screw Company, have acted in good faith and to the best of their ability, skill, and discretion, for the profit and benefit of that Company. This necessarily excludes the idea of a wilful violation of charter, for it is impossible that these defendants could have truly and honestly sworn, they had acted in good faith towards the Screw Company in a matter in which they had knowingly and wilfully violated their

charter. It is worthy of observation, too, in this connexion, that the bill no where charges that the directors knew the act complained of was a violation of their charter. It charges that the act was done with the design to defraud the plaintiff, and that it was a violation of the charter of the Screw Company ; and to this charge the answer is responsive.

Let us look at the circumstances, under which the directors subscribed for this stock.

At the time of the transaction, no case, in which this question of authority was decided or considered, had occurred, either in England or this country. The law on the subject cannot be considered as known and settled.

There are large classes of corporations in Rhode-Island and the other States, which may and do rightfully invest their capital in the stock of other corporations ; such, for instance, as religious and charitable corporations, and corporations for literary and scientific purposes. So insurance companies may rightfully invest their capital in the stock of other corporations, such as banks and railroads, and the like. Nor have we any doubt that the Screw Company might have rightfully taken this stock in the Iron Company, in payment for their rolling-mill, if it had been taken with a view to sell again and not permanently to hold it.

Again, it is to be observed, the directors were not investing the dividends of the Screw Company in the stock of the Iron Company. They had on hand an unsaleable rolling-mill, and they owed a heavy debt for it, and one great object in taking the stock in the Iron Company, was to realize for the rolling-mill and in part pay thereby the debt.

The business, too, of the Iron Company was of a kindred nature with that carried on by the Screw Company; and, so far as the manufacture of rods was concerned, intimately connected with the business of the Screw Company.

It was like the case of a corporation for printing calicoes taking stock in the corporation which manufactured and supplied the print cloths. It deserves, also, to be remarked in this connection, that this question of power never seems to have been raised by the directors or the stockholders in either company, or, by the plaintiff himself, until the present bill was filed. Under these circumstances, and giving proper weight to the answers of the defendants, we feel bound to say, that in subscribing for this stock, they have acted in good faith and with as much care and discretion, as a man of ordinary prudence exercises about his own affairs, and that, if they have fallen into a mistake in regard to their powers, it was an innocent mistake, for which they ought not to be held answerable. We have in Rhode-Island a large number of corporations, whose affairs are managed by directors, who are generally large stockholders and act without compensation. If the innocent mistakes of these gentlemen, in cases where the law was unsettled or unknown, is to subject them for damages, great injustice would be done. The law requires of them care and discretion, such as a man of ordinary prudence exercises in his own affairs ; and if they practise this, and nevertheless make a mistake, the law does not hold them answerable.

The plaintiff's counsel have referred to the amendment of the Screw Company's charter of October, 1845, as showing that the directors must have known they had

no power to take stock in the Iron Company. There were two objects, obtained by that amendment, which could not be obtained without it ; one was the right to increase the capital stock to $300,000, and the other was the right to carry on the business of manufacturing and rolling iron, under the name of the New-England Iron Company. The original charter was for manufacturing purposes, which we think clearly includes the power to manufacture and roll iron, but it must be done as the original charter stood, under the name of the Screw Company. The amendment in effect, authorized them to adopt a new name ; but it did not confer any additional authority to manufacture and roll iron.

Neither do we feel ourselves justified in drawing any inference unfavorable to the defendants, from the fact, that the Screw Company do not appear among the petitioners for the charter of the Iron Company.

If the bill had stopped with the prayer for relief against the directors individually, there would have remained nothing more for us to consider, in deciding the case. But it goes further and prays for a dissolution of the union between the two companies, upon the ground that this union was a violation of the charter of the Screw Company. The bill does not pray for any specific mode of relief in this particular, but the counsel for the plaintiff contended, that the proper mode of relief was to order a sale of the stock of the Screw Company, by a master of this Court, and we will consider the case, as if such specific relief had been prayed for.

The ground of the relief here prayed for is, that the corporation have violated their charter and the decree is asked for against them upon the ground of such violation.

The counsel for the defendants contend that this Court have no power to try any such question or to administer any such relief.

In considering this question, it is important to take an accurate view of the facts.

It is not a case, where the majority of the stockholders have fraudulently violated the charter, for their personal advantage to the injury of the minority, nor is it a case of a wilful violation of the charter. The majority acted in good faith, and under the belief that the charter authorized what has been done.

The question then is, whether in such a case, this Court has power, in a suit by a minority of the stockholders, to decree against the Screw Company a sale of their stock in the Iron Company, upon the ground that the Screw Company had exceeded their corporate powers in taking this stock ? If so, under what head of equity jurisdiction does such a case fall ?

The corporation are not the trustees of the stockholders, so far as the corporate property is concerned. A corporation may become a trustee, as an individual may, and, as such, would be subject to the ordinary jurisdiction of the Court, in relation to the trust property. But the relation of corporation and stockholders does not imply a trust in the corporation.

It is true, the English Court of Chancery have exercised a control over charitable corporations in respect to breaches of trust, but the jurisdiction has been cautiously limited to corporations of that character. Such was the *Attorney General vs. Foundling Hospital*, (4 Bro. 165. 2 Vesey, Jr., 42.) Such corporations are clearly trustees in respect to the charitable fund, for those who are entitled to the benefit of the charity.

But, in respect to a mere trading corporation, like the Screw Company, we do not find any precedent, either in England or this country, for considering the corporate body, as the trustees of the stockholders, and, as such, subject to the general jurisdiction of a Court of Chancery, at the suit of a stockholder.

Let us examine the cases.

In the case of the *Attorney General vs. Utica Insurance Company*, (2 Johns. Ch. R. 371,) Chancellor Kent reviewed, with careful research, the jurisdiction of a Court of Chancery over corporations up to that period. He came to the conclusion, that in the State of New-York, all corporations were amenable to the Supreme Court and to that Court only, according to the course of the common law, for non-user or mis-user of their franchises; and that the jurisdiction of a Court of Chancery over corporations was limited to the directors and officers of the corporation, in their character of trustees, for a breach of trust.

In the case of *Verplanck vs. Mercantile Insurance Company*, (1 Edwards, 84,) the bill was by a stockholder against the Company, charging, among other things, that the Company had violated their charter, and praying for an injunction to restrain the further operations of the Company, and for the appointment of a receiver of all its property and effects, with a view, after payment of debts, to a distribution among stockholders generally, in fact to dissolve the corporation and wind up its affairs.

The Vice Chancellor, while he affirmed the jurisdiction of the Court over the directors, denied in the strongest terms the jurisdiction over the corporation. He held, if the parties stood in the relation of partners to each other, or as *cestui que trust* and trustees, he should have

no doubt as to the authority and duty of the court. But that the corporation were not the trustees of the stockholders, nor did the parties stand in the relative situation of partners, and that a Court of Chancery had no power to interfere with the chartered rights and franchises of a corporation at common law.

The same view is taken of the power of a Court of Chancery, at common law, over corporations, by Chancellor Sanford, in the case of the *Attorney General vs. Bank of Niagara*, (1 Hopkins, 354,) and in the case of the *Attorney General vs. Bank of Chenango*, (1 Hopkins, 598.)

The case of *Verplanck vs. Mercantile Insurance Company*, to which we have referred, (1 Edwards, 84,) came before Chancellor Walworth, on appeal from an interlocutory order, before Vice Chancellor McCoun's decision was made, (2 Paige, 438.) Chancellor Walworth takes the same view of the common law jurisdiction of a Court of Chancery over corporations for breach of charter, as was taken in the cases which we have cited, and refers his authority to act in that case to the statute which confers it. (Revised Statutes of New-York, 463.) These cases show a clear understanding of the profession and the courts of New-York, that at common law no such jurisdiction existed in a Court of Chancery. And this authority is entitled to the more weight, because, from an early period in her history, a large chancery jurisdiction has existed in that State, and has been most ably administered.

The only English case we have been able to consult, which is an authority for this jurisdiction, is the recent case of *Solomons vs. Laing*, decided at the Rolls. It is reported in the London Jurist for April, 1850.

The Bill in that case charged, that the directors in the South Coast Company were guilty of a wilful violation of the charter of that company, in taking stock in the Portsmouth Company, in their names, as trustees of the South Coast Company, and paying therefor with the funds of the South Coast Company.

The Bill, among other things, prayed, that the directors of the South Coast Company might be decreed to have purchased the stock in the Portsmouth Company on their own account, and not as trustees of the South Coast Company; and that the directors of the South Coast Company might be decreed to repay to that company the sums which had been taken from their funds to pay for the stock; and that the Portsmouth Company might also be decreed to repay the same.

The defendants demurred to the bill.    The opinion of the Master of the Rolls is to the effect, that the directors were guilty of a wilful violation of the charter of the South Coast Company, and a breach of trust, and ought to be held to have purchased the stock in the Portsmouth Company on their own account, and ought to be decreed to repay to the South Coast Company the amount which they had taken from the funds of that company to pay for the stock.

It will be seen, that the relief sought was against the directors, and that relief was to be had by decreeing that the stock, which stood in their names as trustees, should be theirs in their own right, and that they should repay to the South Coast Company the amount which they had taken from the funds of that company to pay for the stock.

All this falls within the settled jurisdiction of the Court.

It is true the Master of the Rolls holds the Portsmouth Company also liable to refund, upon .the ground that they knowingly participated in the breach of charter and trust of the South Coast Company, in receiving the money for the stock. But in this respect the decree is against the Portsmouth Company, as against any other party, whether corporation or individual, who has participated in a fraudulent breach of trust.

It does not appear that any other relief was prayed for against the South Coast Company, except to make them with the other defendants pay the costs.

The South Coast Company demurred to the original bill, but they do not appear by demurrer, or otherwise, to the amended bill.

It is proper, also, to bear in mind that the South Coast Company was a Railway Company, having extensive powers under an Act of Parliament; and the Master of Rolls, in his opinion as reported, attaches importance to this circumstance. The bill also charged a wilful breach of charter and trust, which were confessed by the demurrer.

The Screw Company are a trading corporation, having no power under their charter to interfere with the rights of others, any more than a partnership would have; their charter giving them a more convenient organization for the transaction of business, than they could have as a copartnership, and nothing more.

In the present case, too, all that has been done has been done in good faith for the benefit of .the Screw Company, and under the belief that it was lawful.

The counsel for the plaintiff referred to the clause in the charter of the Screw Company, which made the stockholders individually liable for the debts of the com-

pany, and endeavored to support the jurisdiction upon a supposed analogy between such a charter and a case of copartnership.

But a copartnership is a contract, and this is the ground of the jurisdiction. A charter is not a contract, except as between the State and the corporation. The powers and rights and duties of the corporation and of the stockholders, are defined by charter ; and the individual liability of the stockholders is the result of statute and not contract. The same view is taken of this subject in the case of *Verplanck vs. Mercantile Insurance Company,* already referred to.

If this analogy were to hold, so far as to confer jurisdiction, then this Court would be bound to entertain suits generally between the stockholders and the corporation, in respect to the corporate business and property, and the management thereof, and the corporate franchises and a breach thereof—a jurisdiction wholly unknown both in England and in this country.

We do not say, that, where a member of a corporation is illegally excluded by the corporation from his share of the profits, and the amount cannot be ascertained, except by an account, which can only be had in equity, that a Court of Equity will not take jurisdiction, the remedy at law being incomplete. This was the case in *Adley vs. Whitstable Company,* (17 Vesey 315.)

The counsel for the plaintiff have referred to the observations of Lord Cottenham, as announcing the principles which guide intelligent, upright Courts in discharge of the new duties, to which, from time to time, they are called, by the onward movements of civilized society. *Taylor vs. Salmon,* (4 Mylne & Craig 134.) But these observations should be taken with reference to the case then under consideration.

The point in this case was a matter of practice. The plaintiffs in the bill were the directors in a Mining Company, of which the members were so numerous that they could not be made parties. The question was, whether, under such circumstances, the directors might not maintain the suit. The point was ruled in favor of the plaintiffs upon existing rules of practice. The court was exercising a known and settled jurisdiction, and the question was one of mere form.

In the present case, we are called upon to assume a jurisdiction, heretofore unknown to the law.

We readily agree, the law is progressive and expansive, adapting itself to the new relations and interests which are constantly springing up in the progress of society. But this progress must be by analogy to what is already settled, especially with reference to jurisdiction, which is not to be extended to new cases, unless they bear some analogy to what is already established.

Thus, when Lord Hardwicke first entertained a bill by a corporation against directors, he referred the authority of the court to the well known head of equity jurisdiction over trustees, considering the directors in the light of trustees, and in that capacity answerable to the court for a breach of trust.

Besides, corporations, like the Screw Company and Iron Company, are not of recent origin. They have existed to a limited extent in England for centuries, and to a great extent in this country for more than half a century. And yet no jurisdiction, like this, has ever been exercised in this country, and none in England, unless the recent case decided at the Rolls, may be considered an authority in favor of the jurisdiction.

This power over corporations, not being vested in this Court by law, we think it far better and safer that the General Assembly should confer it, if it be thought for the public good, rather than that we should assume it.