# United States Court of Appeals
## For the First Circuit

Nos. 02-1371, 02-1407

JUDITH A. LAWTON; THOMAS LAWTON; MARSHA E. DARAS; STEPHEN H.
LAWTON; NANCY LAWTON CRONIN; DAVID T. LAWTON; T. MICHAEL LAWTON;
JOANNA J. LAWTON; SUZANNE M. LAWTON,

Plaintiffs, Appellees/Cross-Appellants,

v.

ROBERT NYMAN; KEITH JOHNSON; KENNETH NYMAN,

Defendants, Appellants/Cross-Appellees,

NYMAN MANUFACTURING CO.,

Defendant, Cross-Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

[Hon. Ernest C. Torres, U.S. District Judge]

Before

Selya, Circuit Judge,
Stahl, Senior Circuit Judge,
and Lynch, Circuit Judge.

Robert Corrente with whom Brian C. Newberry and Hinckley,
Allen & Snyder LLP were on brief for appellants.

Karen Pelczarski with whom Staci L. Kolb and Blish & Cavanagh,
LLP were on brief for appellees.

April 29, 2003

**LYNCH**, **Circuit Judge**.    Following trial, the district court found officers and directors with voting control of a closely held family corporation, Nyman Manufacturing Co., to be in breach of their state law fiduciary duties to minority shareholders whose shares the three had caused the corporation to redeem without making adequate disclosures.    Robert Nyman, Kenneth Nyman, and Keith Johnson were held jointly and severally liable to nine Nyman family members for the total sum of $2,096,798.50, which was, roughly, the value of those shares at the time of the sale of the Nyman corporation to a strategic buyer some sixteen months later, following the redemption of their shares.    The court also awarded prejudgment interest under state law at the rate of 12 percent from May 30, 1996, the date the plaintiffs sold their shares.

The three defendants appeal, on the basis that the liability finding of breach of fiduciary duty was error in that the non-disclosed information was not material.    They also argue the court erred in its award of damages and as to the date on which prejudgment interest started to run.    The plaintiffs cross-appeal, find fault with the damages, and argue they were entitled to more.

We affirm the liability finding and remand for further proceedings on the appropriate measure of damages.

I.

Nyman Manufacturing Company was a closely held, fourth-generation family-owned company in Rhode Island that manufactured

-3-

paper and plastic dinnerware. Robert Nyman, the President and CEO of the company, and his brother Kenneth, the Vice-President of Manufacturing, had worked in the business their entire adult lives.

There were two classes of company stock: Class A shares, which were non-voting, and Class B shares, which were voting stock. The company's articles of incorporation authorized 13,500 shares of Class A stock and 1,500 shares of Class B stock. Traditionally, one or two family members owned all of the Class B stock, while the Class A shares were dispersed throughout the family. No dividends were ever paid on either class of stock. Robert and Kenneth Nyman had each inherited 375 shares of the Class B voting stock from their uncle; this was the entirety of the issued Class B stock. Because they were the controlling shareholders, we refer to them as the majority shareholders of the company. In the beginning of 1995, there were 8,385 shares of Class A stock outstanding. Judith Lawton, the sister of Robert and Kenneth, owned Class A stock, as did her husband and eight children. The Lawtons together owned 952 Class A shares. The children of Robert and Kenneth together owned another 140 Class A shares. Beverly Kiepler, another Nyman sibling, and her daughter together owned 700 Class A shares. The Magda Burt Estate controlled 2,256 Class A shares, and the Walfred Nyman Trust controlled 1,677 Class A shares.

The company teetered on the verge of bankruptcy in the late 1980s. In 1991, the company's performance again began to

suffer.  In 1994, after three consecutive years of losses, the company hired Keith Johnson, a specialist in turning around and then selling companies, as a consultant.  Johnson was made the Chief Financial Officer and Treasurer in August 1994, and his liability stems from his position as an officer.[1]  He was promised an equity share of the company if he could revive the company's flagging profits.

By the spring of 1995, it appeared that the fortunes of the ailing company were being reversed.  Earlier, in the fiscal year ending March 25, 1995, the company reported a profit of nearly $1.6 million, in vivid contrast with its past losses.  On April 3, 1995, the company granted Johnson 1,000 options to buy Class A stock at $145.36 a share.  This price was equal to eighty percent of book value; no effort was made to ascertain the actual market value of the stock, as required by the bylaws.[2]  In the words of the district court, at this time "the prospect of a future sale of the company to a strategic buyer was, at most, nothing more than a remote possibility."

In July 1995, after a series of discussions, the company offered to redeem 2,256 shares from the Magda Burt Estate.  On

---

[1] For convenience sake, we refer to the three defendants using the term majority shareholders although Johnson did not hold Class B voting shares and purchased Class A shares later.

[2] The district court found that the award of options to Johnson, who had accepted a lesser salary in exchange for an equity share, was not improper.

-5-

November 6, 1995 the Burt shares were redeemed for $145.36 per share.  That price represented eighty percent of the $180 book value of the stock in April 1995.  The price was not pegged to the higher November 1995 book value of $312.02 a share.[3]  After probate court approval, the estate accepted and the deal closed on November 6, 1995.  That same day, the Board, which now consisted of Johnson, Robert and Kenneth, issued options to these three to buy the same number of shares as those redeemed, at the same price, $145.36 a share.  Robert received 1,128 options, while Kenneth and Johnson received 564 options each.

In January 1996, the company also offered to redeem the shares held by the Walfred Nyman Trust.  The offer was again for $145.36 a share.  By that time, the book value had risen to $318.59 a share.  One of the beneficiaries of the trust, Beverly Kiepler, withheld agreement, and the offer was abandoned.

The company's fiscal year ended on March 29, 1996.  The unaudited financials showed a profit of $3.5 million and a quadrupling of shareholder equity.  Although it is true that much of the profit came from non-recurring items, it is also true that the three defendants, sitting as the Board, adopted deferred

---

[3] Under Rhode Island law, book value is not necessarily the fair value of a share.  Egan v. Wirth, 58 A. 987, 992 (R.I. 1904).  Since defendants pegged the option price to book value, we continue to use it to keep comparisons in like format.

compensation plans for themselves which had a total value of $2 million.

They also decided to hire a consultant and, at the March 20, 1996 annual meeting, authorized Johnson to begin to interview candidates. Although the defendants dispute that their intent was for the consultant to help them sell the company, the district court permissibly inferred, from the evidence at trial, that such was their purpose. This inference was based, inter alia, on the contents of the retention letter with the consultant eventually hired, Shields & Co., dated in August 1996, which was, in turn, based on an earlier meeting. That letter made clear that Shields would offer services including:

1. strategic issues as they relate to the long-term value of Nyman;
2. operational issues to maximize Nyman's position in the future in the eyes of a potential acquirer;
3. the specific dynamics of the merger and acquisition market;
4. assist you in responding to the numerous acquisition inquiries when appropriate . . . .

None of this information was disclosed to the minority shareholders. There is evidence, not specifically referred to by the district court, that by May 1996 the three defendants were also engaged in discussions, also undisclosed, to acquire other companies. Those discussions did not lead to a merger or acquisition.

In April 1996, Johnson, on behalf of the company, offered to purchase 700 shares of Class A stock directly from Kiepler and her daughter for $145.36 a share. By that point, shareholder equity had risen to $576.40 per share. Johnson put Kiepler under a false deadline, saying that the bank waivers which would permit the purchase would expire on May 1, 1996. This was untrue: no waivers had yet been secured. Kiepler declined the offer, based on the low price.

On May 8, 1996, the company, over Johnson's signature, sent letters to all Class A shareholders except Robert and Kenneth, their spouses, and the Walfred Nyman Trust, offering to redeem their shares for $200 per share. The letter said the following:

> I would like to report to you some information about Nyman Mfg. and a limited term opportunity that you now have as a Nyman shareholder with [] shares of Class A Non-Voting Stock.
>
> As you know, the Company has had major "ups and downs" over the past 10 years including 5 years in which significant losses were experienced. In the two most recent years, the Company's financial condition has improved and its lending banks have agreed that limited amounts of its common stock may be re-purchased. This is an opportunity for shareholders who are interested in achieving liquidity now.
>
> Last November, the Company was able to re-purchase certain shares of stock held by Rhode Island Hospital Trust Bank as co-executor of Marge Burt's estate at a price of $145.36 per share. Since that time, the Company has received several inquiries from other minority shareholders concerning their desire to sell their shares of Nyman Mfg. Co. stock. In response to these inquiries, the Company has negotiated with its lending banks to allow it to offer to purchase additional shares of Nyman stock at this time.

Given favorable economic factors and current estimates of operating results, the Company is offering to purchase all of your shares at a price of $200 per share.

Since the Company cannot provide you with any advice as to whether the sale of the stock by you is in your best financial interest, we suggest that you discuss this matter with your financial advisor. You should know that these receipts will be subject to the appropriate federal and state taxes and that you should consult with a tax advisor, particularly with regard to your share of any tax-loss carry-over from the Magda Burt estate which may help to reduce any tax liability you may have.

Please indicate on the enclosed form your interest in selling your [] shares back to the Company at the offer price of $200.00 per share for a total value of []. This offer will expire on May 22, 1996. The Company is planning to complete this transaction with you within two weeks after the receipt of your written acceptance of this offer along with the receipt of your stock certificates.

Several statements in the letter were not accurate. The record shows that the impetus to redeem the shares came from the company, not that the company made the offer in response to several inquiries from other minority shareholders concerning their desire to sell their stock. The record also shows that there was no bank-imposed deadline of May 22, as the letter implied. One lender had imposed no deadlines and the other had imposed a deadline of July 29. This phoney deadline of May 22 meant that the minority shareholders had to decide whether to sell before the company made its next audited financial statements available.

The next day, on May 9, 1996, Johnson reported to Heller Financial, Inc. that Nyman's fiscal year-end profit was

estimated to be $3.533 million, and he included a copy of Nyman's unaudited FY 1996 financial statement. The unaudited financials were not disclosed to plaintiffs, nor was the decision to retain a consultant, nor was the fact that the defendants were in May engaged in discussions to acquire other companies. The letter also implied that the $200 a share price was based on "favorable economic factors and current estimates of operating results," but did not disclose what was meant by this. The stock price of $200 a share was based on neither current market value nor book value. Defendants did not seek to have an appraisal done.

On May 10, Robert called Judith Lawton to ensure that she had received the letter. He described the offer as a "once in a lifetime" opportunity. He gave no further financial information about the company's recent upturn or its plans.

Most of the Lawtons met on the evening of May 10 and, after ruminating over the weekend, all of the Lawtons who held stock in Nyman Manufacturing Co. agreed to sell their shares. Judith, her husband Thomas, and seven of their children sold all of their combined 952 shares back to the company on May 30, 1996 for $200 a share; the children of Robert and Kenneth Nyman also sold their 140 shares back to the company at $200 a share. Because this stock was redeemed by the company, the redemption increased defendants' share of the Class A stock.

On June 25, 1996, the company awarded Robert, Kenneth, and Johnson options to purchase a total of 1,092 Class A shares. This is the same as the number of shares redeemed by the company on May 30. Robert received the right to purchase 432 shares, and Kenneth received the right to purchase 330 shares, for $220 a share.[4] Johnson received the right to purchase 330 shares for $200 a share.

The officers also purchased all Class A and B shares in the company treasury on June 25. For these they signed promissory notes totaling $973,000 that called for interest payments to be made commencing on June 30, 1997. Robert purchased 1,675 Class A and 375 Class B shares; Kenneth purchased 1,250 Class A and 375 Class B shares; and Johnson purchased 1,190 Class A shares. Again, there was no appraisal of shares.

By June 1996, the book value of the shares was $527.50. The district court accepted the valuation of defendants' expert, William Piccerelli, that in May and June 1996, the fair market value of the company's stock was approximately $303 a share.

Johnson at some point discovered that the Van Leer Corporation, a Dutch company whose subsidiary, Chinet, was a competitor of Nyman Manufacturing, had funds available to acquire other companies. In October 1996, Johnson discussed with Thomas

_____

[4] The stock option plan required majority shareholders to pay 110 percent of "fair market" value.

Shields, a principal of Shields & Co., the possibility of a strategic acquisition by Van Leer. These discussions between Johnson and Shields & Co. continued in January 1997. In March 1997, Johnson met with representatives of Van Leer to discuss a sale. Van Leer offered to purchase the company, and it signed a letter of intent on June 25, 1997. The sale closed on September 29, 1997.

Van Leer purchased all of Nyman Manufacturing's stock for $28,164,735.00. After deducting closing costs of $980.383.00, and an escrow amount of $1,423,331.00, set aside to satisfy a potential liability of the company, the net amount paid to shareholders was $25,761,021.00. Some $1,667.38 was paid for each of the 13,500 Class A shares and options, and $2,167.59 was paid for each of the 1,500 Class B shares, 1.3 times the price of the Class A shares. Van Leer asked that the stockholders' options not be exercised, and in return, the options were bought as if they had been exercised.

A chronology is set forth at the end of the opinion.

## II.

Judith and Thomas Lawton and seven of their eight children filed suit against Robert and Kenneth Nyman, Keith Johnson, and Nyman Manufacturing in the United States District Court for the District of Rhode Island on May 22, 1998. They alleged that the defendants were in breach of their fiduciary duties and had committed securities and common-law fraud. The

-12-

plaintiffs asserted that the redemption price they were paid for their stock was less than the true value, that the defendants knew that the company might be sold, and that they misrepresented and failed to disclose material facts regarding, inter alia, the sale of the company and the value of the stock.

A parallel suit was filed by Beverly Kiepler, the beneficiary to the Walfred Nyman Trust who originally rejected the sale of the trust's Class A shares, and her daughter, against Robert, Kenneth and Johnson. She alleged that the defendants' award of options to themselves, and their purchase of treasury stock, diluted the stockholders' ownership interests.

After separate bench trials, the district court issued two opinions on the same day. In the Kiepler case, the court found that the purchase of treasury shares had constituted a breach of fiduciary duty, but that the granting of options to purchase shares was not in violation of that duty. Kiepler v. Nyman, No. 98-272-T, 2002 U.S. Dist. LEXIS 19630 (D.R.I. Jan. 17, 2002).[5]

In the Lawton case, the court found that the company's purchase of the Lawtons' shares was a breach of common-law fiduciary duty. However, the court dismissed the federal securities law claims, finding that disclosure was not required under the applicable statutes. It also found that the claim against the granting of the options failed because it should have

---

[5] The Kiepler case ultimately settled.

-13-

been brought as a derivative shareholder action on behalf of the corporation, and that the April 1995 grant to Johnson was, in any event, not in breach of any duty. Lawton v. Nyman, No. 98-288-T, 2002 U.S. Dist. LEXIS 17398 (D.R.I. Jan. 17, 2002). The court held that it was a breach of fiduciary duty for the defendants to have purchased the treasury shares in June 1996, and accordingly subtracted those shares in determining the value per share in September 1997, but did not deduct the price defendants paid for those shares from the valuation of the company. The Lawton plaintiffs appealed the damages calculation and the dismissal of their federal securities claim and their claim regarding the grant of options; the defendants appealed the breach of fiduciary duty finding and the damages award.

## III.

We review the district court's legal conclusions de novo, and its factual conclusions after a bench trial for clear error. Walsh v. Walsh, 221 F.3d 204, 214 (1st Cir. 2000). We review damages awards for abuse of discretion. Trull v. Volkswagen of Am., Inc., 320 F.3d 1, 9 (1st Cir. 2002). An error of law is an abuse of discretion. Seavey v. Barnhart, 276 F.3d 1, 9 n.8 (1st Cir. 2001).

A. Breach of Fiduciary Duty Under Rhode Island Law

The defendants frame their challenge to the breach of fiduciary duty finding by arguing that the district court failed to

-14-

use the correct standard of materiality. They argue the district court was required to use the same standard of materiality for both the federal securities law claim, under Section 10b of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) (2000), and the state common-law fiduciary duty claim; the fact that the court found on materiality grounds that there was no federal securities law violation means, they argue, that it was error for the district court to have found that there was a violation of state law fiduciary duties.

Whatever doubts we have about the district court's federal securities law analysis need not be resolved. There is no need to explore whether there are significant differences between the disclosure standards under Section 10b and the Rhode Island law on fiduciary obligations owed among shareholders in closely held family corporations. The parties agreed at oral argument that the federal securities law claims have essentially dropped out of the action. We do refer to federal securities law cases by analogy and because Rhode Island law may look to them for guidance.

Defendants here stand in three intertwined capacities: as directors, as officers, and, for Robert and Kenneth Nyman, as majority shareholders of a closely held corporation. We consider these capacities as a group for purposes of the analysis. For more than a century, Rhode Island law has viewed directors of companies as owing a fiduciary duty to the shareholders of the company.

-15-

Olney v. Conanicut Land Co., 18 A. 181, 182 (R.I. 1889).  It has analogized the duties corporate officers owe to stockholders to those of trustees.  Point Trap Co. v. Manchester, 199 A.2d 592, 595-96 (R.I. 1964); Hodges v. Screw Co., 1 R.I. 312, 340-41 (1850).

> Such a relationship is one of trust and confidence and imposes the duty on the fiduciary to act with the utmost good faith.  That good faith requirement forbids action on the part of a fiduciary without the knowledge and consent of his cestui que trust when he has an individual interest in the subject matter or when his interest is in conflict with that of the person for whom he acts.

Point Trap, 199 A.2d at 596.  Rhode Island law also provides that directors of an insolvent corporation owe this fiduciary duty to creditors.  Olney, 18 A. at 182; see Ed Peters Jewelry Co. v. C & J Jewelry Co., 51 F. Supp. 2d 81, 99 (D.R.I. 1999).

In A. Teixeira & Co. v. Teixeira, 699 A.2d 1383 (R.I. 1997), the court reiterated that corporate officers stand in a fiduciary capacity and are liable if they take corporate opportunities; if a small number of shareholders in a corporation act as though they were partners, then they have a fiduciary duty to each other as partners.[6]  Id. at 1386-88.  The claim at issue here involves, by contrast, breach of a duty to minority shareholders.

___

[6] In Tomaino v. Concord Oil of Newport, Inc., 709 A.2d 1016 (R.I. 1998), the court applied similar Massachusetts law as developed under the Donahue doctrine.  Id. at 1021 (citing Donahue v. Rodd Electrotype Co. of New Eng., Inc., 238 N.E.2d 505, 515 (Mass. 1975)).

The Rhode Island Supreme Court has had no occasion to expressly define the obligations owed by shareholders to each other in a closely held family corporation. But in Teixeira the court reiterated that "shareholders in a close held family corporation may have a fiduciary duty toward one another." Id. at 1387 (citing Estate of Meller v. Adolph Meller Co., 554 A.2d 648, 651-52 (R.I. 1989), and Fournier v. Fournier, 479 A.2d 708, 712 (R.I. 1984)) (emphasis added). The court noted that "the existence of such a fiduciary duty is a fact-intensive inquiry" and that shareholders could show by evidence, such as a stockholder's agreement, that no such duty had been undertaken. Id.

The fiduciary duties of corporate directors, officers and majority owners encompass a variety of different situations. See generally P.M. Rosenblum, Corporate Fiduciary Duties in Massachusetts and Delaware, in How to Incorporate & Counsel a Business 293 (MCLE 2000); L.E. Mitchell, The Death of Fiduciary Duty in Close Corporations, 138 U. Pa. L. Rev. 1675 (1990). Still, defendants have essentially conceded that Rhode Island law would recognize a fiduciary duty among shareholders in a closely held family corporation and that it would be a heightened duty. We too think that the Rhode Island Supreme Court would recognize such a duty, at least in the absence of an express shareholder agreement to the contrary.

This case involves the narrow question of the duties owed by officers and directors, including those who are majority controlling shareholders in a closely held corporation, to minority shareholders when the defendants offer to buy, or have the corporation redeem, the shares of minority shareholders. What precise duties are owed in this situation is also a question on which there is no direct precedent in Rhode Island law. Given Rhode Island's rule that officers have a fiduciary duty, we think Rhode Island is likely to adopt at least those duties required by the common law "special facts" rule, as described by our sister circuit:

> Close corporations buying their own stock, like knowledgeable insiders of closely held firms buying from outsiders, have a fiduciary duty to disclose material facts. . . . The "special facts" doctrine developed by several courts at the turn of the century is based on the principle that insiders in closely held firms may not buy stock from outsiders in person-to-person transactions without informing them of new events that substantially affect the value of the stock. See, e.g., Strong v. Repide, 213 U.S. 419, 29 S. Ct. 521, 53 L. Ed. 853 (1909), and the cases discussed in Comment, Insider Trading at Common Law, 51 U. Chi. L. Rev. 838 (1984); cf. Janigan v. Taylor, 344 F.2d 781 (1st Cir. 1965) . . . .

Jordan v. Duff & Phelps, Inc., 815 F.2d 429, 435 (7th Cir. 1987).[7] The Colorado Supreme Court applied the "special facts" rule in a case factually similar to this:

---

[7] Jordan draws a strong dissent from Judge Posner on the liability finding based on the facts of the case. See 815 F.2d at 444 (Posner, J., dissenting). For a more general critique, see D.A. DeMott, Beyond Metaphor: An Analysis of Fiduciary Obligation, 1988 Duke L.J. 879.

-18-

> We hold, therefore, that it is a violation of a fiduciary duty for an officer or director of a closed corporation to purchase the stock of minority shareholders without disclosing material facts affecting the value of the stock, known to the purchasing officer or director by virtue of his position but not known to the selling shareholder.

Van Schaack Holdings, Ltd. v. Van Schaack, 867 P.2d 892, 899 (Colo. 1994). Again, defendants agree that under Rhode Island law there is a duty to disclose material information to minority shareholders faced with an offer by the close corporation, controlled by majority shareholders, to purchase their shares.

The district court defined the standard for determining materiality as follows: "When directors of a closely held corporation are purchasing a minority stockholder's shares, fiduciary duty imposes an obligation of 'complete candor' to disclose 'all information in their possession 'germane' to the transaction.'" (quoting F.H. O'Neal' & R.B. Thompson, O'Neal's Close Corporations § 8.12, at 129 (3d ed. & Supp. 1995)). That is a generally accepted standard and its use was appropriate. The court found that under state law, negotiations for a sale need not be underway for there to be a duty to disclose; the duty "also encompasses transactions that the directors anticipate are reasonably likely to occur or that are something more than remote possibilities." The district court, in its finding that the defendants were in breach of their fiduciary duties, focused on the company's repurchase of the plaintiffs' stock for $200 a share in

-19-

May 1996, when the defendants, as it found, had a realistic expectation that Nyman Manufacturing might be sold.

The defendants argue that when a company is considering the possibility of sale, the standard for materiality, even under state law, requires something much more definite. Defendants cite to Section 10b securities cases in support.[8] See, e.g., List v. Fashion Park, Inc., 340 F.2d 457 (2d Cir. 1965); James Blackstone Mem'l Library Ass'n v. Gulf, Mobile & Ohio R.R., 264 F.2d 445 (7th Cir. 1959). The cases they cite, however, do not apply federal securities law to closely held corporations.

It seems to be commonly accepted that officers of close corporations have a greater duty of disclosure about the possible sale or merger of a company to minority shareholders than do officers of a publicly traded corporation.[9] See, e.g., Michaels v. Michaels, 767 F.2d 1185, 1196-97 (7th Cir. 1985). One reason given is that premature disclosure could itself do more harm than good in a publicly traded market, because it could lead to inflation of the

---

[8] The question of when directors and officers, under a fiduciary duty, must disclose possible actions is one not restricted to closely held corporation or even to the securities laws. It also comes up under ERISA. See Vartanian v. Monsanto Co., 131 F.3d 264, 272 (1st Cir. 1995) (finding a fiduciary duty of disclosure when an employer fails to disclose its "serious consideration" of whether to adopt a change in employee plan benefits that would affect the plaintiff). Of course, there may be different thresholds depending on context.

[9] In its ruling on the federal securities law claim the district court referred to a case involving public companies. See Jackvony v. RIHT Fin. Corp., 873 F.2d 411 (1st Cir. 1989).

-20-

stock price which might prevent the sale or merger.  See Flamm v. Eberstadt, 814 F.2d 1169, 1176 (7th Cir. 1987).  In public companies, there is also more of a need for a certain, clear rule as to when disclosure is required.  Id. at 1178; Greenfield v. Heublein, Inc., 742 F.2d 751, 757 (3d Cir. 1984).  As the Seventh Circuit has recognized, those reasons disappear when, as here, "there is no public market for a shareholder's stock."  Michaels, 767 F.2d at 1196.  In a close corporation the company need disclose a decision to sell only to the person whose stock is to be acquired and the company may extract promises of confidentiality.  See Jordan, 815 F.2d at 431.

Rhode Island law would, we think, similarly recognize a heightened duty of disclosure in a close corporation setting by officers who are majority shareholders with undisclosed information, who are purchasing minority shares or causing the corporation to do so.  It would also, we think, impose an objective rather than a subjective standard of materiality.  See, e.g., TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 445 (1976); see also Jackvony v. RIHT Fin. Corp., 873 F.2d 411, 415 (1st Cir. 1989).

Materiality depends on all the circumstances.  The general rule under the securities laws is that when contingent or speculative events are at issue the materiality of the events "depends on the probability that the [event] will be consummated, and its significance to the issuer of the securities."  Basic Inc.

-21-

v. Levinson, 485 U.S. 224, 250 (1988) (emphasis added). No single factor is necessarily determinative of the materiality inquiry. See id. at 239. Here there were only two possible types of buyers for plaintiffs' shares -- the defendants (either directly or by causing redemption of the shares) or an outside buyer looking to acquire the company. Here the defendants did not disclose their decision to work toward selling the company, their decision to hire a consultant, or their acquisition talks in May with other companies. Each is pertinent to the question of whether there was an outside buyer for the shares.

The mere causing of a closely held corporation to offer an inadequate price by majority shareholders to minority shareholders is not itself sufficient to establish a breach. It may be evidence, though, as to breach of other duties. And if a majority shareholder violates his duties of disclosure and the minority shareholder sells at an inadequate price, the minority shareholder can seek damages based on the difference between the offered price and the fair value of the stock. See Sugarman v. Sugarman, 797 F.2d 3, 8 (1st Cir. 1986) (applying Massachusetts law in freeze-out scenario).

If the finding of breach of fiduciary duty turned purely on the definiteness of the plan to sell, this would be a difficult liability issue. However, the case does not turn on that isolated proposition, but instead on an interrelated series of non-

-22-

disclosures and misrepresentations. There is ample evidence to support the district court's finding of breach of fiduciary duty.

As the district court held, the redemption of the plaintiffs' stock represented a marked departure from the company's previous lack of interest in purchasing stock. As the district court also held, "Additional indications of the defendants' suddenly strong and, otherwise, inexplicable interest in acquiring more shares may be found in the urgency with which they sought to redeem the Lawton and Kiepler shares as shown by the artificial deadlines established for responses to the redemption offers."

The evidence supports the plaintiffs' theory that these defendants engaged in a concerted, accelerating effort to buy up the minority shareholders' stock, thus increasing the defendants' ownership of the company, in anticipation of a sale of the company. We understand the district court to have concluded that the non-disclosure of the possibility of a sale was material, even at this early stage, because it motivated the defendants' actions and was information which would aid and be important to the plaintiffs in evaluating the offer made.

There is more than adequate supporting evidence. There was evidence defendants were willing to violate the bylaws in the price set for options they acquired. Indeed, the district court found the corporation had from 1995 embarked on a program to "re-purchase shares of the Company in order to eliminate any

-23-

shareholders who are not active in day-to-day operations of the Company." (internal quotations omitted). The district court found that the defendants made the decision to redeem the minority shares even though the company had a pressing need for cash and was laying off workers to conserve funds. The district court reasonably concluded that the explanation was that "on May 8, 1996, when the defendants offered to buy back all of the plaintiffs' shares, they anticipated that the company soon could be sold for much more than the amounts that they paid for those shares."

Of course, with the May 1996 redemption offer the plaintiffs knew that defendants (and their families) were attempting to get sole ownership of the company. This might have led a reasonable investor to ask why and to seek further information. Still, this is not enough to render immaterial as a matter of law the undisclosed and misrepresented information. In all events, the district court's factfinding that there was a violation is supportable.

Thus, the evidence reasonably can be interpreted to show a scheme by defendants to obtain total ownership of the company for less than fair value through a variety of devices, anticipating a future sale. The devices fall into two general categories: first, the failure to disclose that management had decided to try to sell the company and, second, the withholding of other material information as to the redemption and misrepresentation of other

information.  For example, while defendants on May 9 thought it was material to Nyman's lenders that they have the company's unaudited financials, the defendants failed to disclose that information to the plaintiffs.  To effectuate this scheme, defendants pressured plaintiffs to sell by imposing false deadlines, telling Judith Lawton this was a "once in a lifetime opportunity," failing to disclose financial information which would call into question the adequacy of the price offered, and timing the offer so that plaintiffs would not have the audited financial results while defendants simultaneously disclosed financial results to lenders. See Jordan, 815 F.2d at 434 (board's decision to seek a buyer coupled with fact that one putative buyer considered company to be worth $50 million sufficient to support a finding of materiality in close corporation).

We find no clear error in the conclusion that this totality of information would be germane and material to a selling minority shareholder and we uphold the liability finding.

B.  Damages

1.  Theory of Damages Calculation

The district court's method of calculating damages in this case is essentially a conclusion of law, to which we give full review.  See Wilson v. Great Am. Indus., Inc., 855 F.2d 987, 996 (2d Cir. 1988).  In general, as the district court recognized, where immediate rescission of the purchase is unavailable, there

are two different approaches to damages for non-disclosure by majority shareholders in a closely held corporation, with variations on both themes. The usual rule is to measure the plaintiffs' loss by the difference in price between what they received for their stock and its fair value at the time of sale. See, e.g., Sugarman, 797 F.2d at 8 (applying Mass. law); Holmes v. Bateson, 583 F.2d 542, 562 (1st Cir. 1978).

In appropriate cases, another approach, used in defrauded seller cases under federal securities laws, is to require defendants to pay over their wrongful profits in order to avoid unjust enrichment of a wrongdoer. Janigan v. Taylor, 344 F.2d 781 (1st Cir.). In a case involving a violation to a defrauded seller in a public company under § 28(a) of the Securities Act,

> the correct measure of damages . . . is the difference between the fair value of all the . . . seller received and the fair value of what he would have received had there been no fraudulent conduct, except for the situation where the defendant received more than the seller's actual loss. In the latter case damages are the amount of the defendant's profit.

Affiliated Ute Citizens v. United States, 406 U.S. 128, 155 (1972) (citing Janigan, 344 F.2d at 786); see Holmes, 583 F.2d at 562.

Under Rhode Island damages law, "The basic precondition for the recovery of lost profits is that such a loss be established with reasonable certainty. Although mathematical precision is not required, the [trier of fact] should be provided with some rational model of how the lost profits occurred and on what basis they have

been computed." Long v. Atl. PBS, Inc., 681 A.2d 249, 252 (R.I. 1996) (citations and internal quotation omitted). "We do not require mathematical certainty in this calculation. All that is required is that the court be guided by some rational standard." Abby Med./Abbey Rents, Inc. v. Mignacca, 471 A.2d 189, 195 (R.I. 1984) (citation omitted). At the same time, damages awards may not be based on speculation. MacGregor v. R.I. Co., 60 A. 761, 762 (R.I. 1905); see Thermo Electron Corp. v. Schiavone Constr. Co., 958 F.2d 1158, 1166 (1st Cir. 1992). Finally, where breach of fiduciary duty is involved, the Rhode Island courts have looked to equity for appropriate remedial principles. See, e.g., Matarese v. Calise, 305 A.2d 112, 119 (R.I. 1973). We caution that we are not deciding federal securities law questions, but rather look to cases involving the securities laws for guidance on how the Rhode Island courts would address the question. The choice between these remedies is within the discretion of the district court, but must accord with proper legal principles. See Siebel v. Scott, 725 F.2d 995, 1002 (5th Cir. 1984).

> a.   Difference between price received and fair value
>      absent the breach of fiduciary duty

The district court used September 1997, when the company was sold to Van Leer, as the relevant time to compute the difference between the price received and the fair value. The usual rule is that the fair value is to be determined as of the time of the plaintiffs' sale. The district court departed from the

-27-

usual rule based on two rationales. First, the court thought "it is reasonable to conclude that, if the possibility of a sale had been disclosed, the plaintiffs would not have sold their shares for $200 each; but, rather, would have held on to [their shares] in the hope that the sale would take place." Second, it found that, "Since, in May of 1996, it was not certain that Nyman Manufacturing would be sold, it is impossible to calculate precisely the strategic value of the plaintiffs' stock at that time. The best indication of that value is [the sale price in September 1997]." Neither rationale can be sustained on this record.

There are a number of problems with the rationale that plaintiffs would have retained the stock over the next sixteen months if the requisite disclosures had been made. None of the plaintiffs testified to this effect, and there is no other evidence from which this conclusion can be drawn. Moreover, it is inconsistent with other findings the court made. The conclusion itself does not establish whether the plaintiffs would have sold had all the material information been provided. Further, it does not establish whether plaintiffs, in possession of all material information, would have sold if they had been offered $303 a share, a price the district court determined to be the fair market value in May 1996, or whether plaintiffs would have sought a premium, and if so, what premium. And it does not establish whether defendants would have proceeded with redemption at any of these higher prices.

Key subsidiary factual findings are simply absent; largely, we suspect, because the parties neither produced the evidence nor requested the findings.

There is no evidence in the record to support the "conclusion" that "if the possibility of the sale had been disclosed" in May 1996, the plaintiffs would have held their stock until September 1997, some sixteen months later. The plaintiffs never testified to this at all, despite the ease with which this line of questioning could have been explored. Further, the factual findings made do not support this theory. The district court noted that plaintiffs had not bothered to seek additional financial information or outside advice before they sold their stock in May, that at least some of the plaintiffs had been exploring the possibility of redemption for some time, that plaintiffs accepted the offer two weeks before the deadline and within days after the offer was made, and that the decision was reached over a weekend after a family conference. These findings are more consistent with the conclusion that the family members would have leapt at the opportunity to sell in May 1996, especially at $303 a share, even if told that management was considering a sale of the company and in possession of the unaudited financials.

On appeal, the plaintiffs attempt to excuse their lack of proof by referring to our decision in Ansin v. River Oaks Furniture, Inc., 105 F.3d 745 (1st Cir. 1997), which upheld an

inference that the plaintiffs would not have sold their stock when they did had they known about plans for an initial public offering (IPO). Id. at 758. Plaintiffs overread Ansin. In that case, the evidence showed at least one of the plaintiffs was initially planning to hold his stock until the IPO but was pressured into an early sale. Id. at 750-51. Further, there were actual sale negotiations which had not been disclosed, and the defendants knew, at the time they purchased the shares, that the preconditions for an IPO had been met. The court inferred that plaintiffs would not have deviated from their initial plan had they known about the impending IPO. By contrast, here there was no evidence of the plaintiffs' investment goals or how they would have responded to news of the potential sale of the business.

Plaintiffs' rejoinder in their briefs is that of course they would have held on to their stock in May 1996 had they known what their shares would have been worth when the company was sold to Van Leer. The argument very much misses the point. No one knew in May 1996 that the company would be sold in September 1997 for a per share value of about nine times what the plaintiffs were paid. The damages must be tied somehow to the information withheld or misrepresented. The information withheld was not that the company would in fact be sold to a strategic buyer some sixteen months later, much less at that price.

This theory that plaintiffs would have held on to their stock is also inconsistent with the district court's conclusion that, "Although it is fairly clear that by May 8, 1996, the defendants anticipated the possibility that Nyman Manufacturing would be sold, there is no indication that, at the time, a sale was anything more than a mere possibility."[10]  Nothing in the record establishes that a mere possibility of sale of the company would have led plaintiffs to retain their stock.  That is particularly so if they had been offered $303 a share in May 1996, the fair market value the district court accepted as true through Piccerelli's expert testimony.

We also reject the district court's second rationale -- that the sale price of the corporation some sixteen months later in 1997 represented a reasonable proxy for the market value of the shares in May 1996.  No evidence supports this conclusion, and it is clearly erroneous.  Indeed, several of the district court's other findings undercut its conclusion.  The court found, as noted, that the fair market value of minority-held Class A stock in May 1996 was $303 a share.  It found that while there could be a premium over market value for a strategic sale of the company,[11]

---

[10] The district court also later used the phrase "distinct possibility."

[11] It is not clear whether the fair market value of the stock in May 1996, $303 a share, assumed disclosure of the possibility of a sale.  The district court at times seems to refer to an additional strategic sale bonus to the value of the stock if the

there was, as of May 1996, no likelihood of a sale, only a "mere possibility." Finally, the district court rejected the testimony offered by the plaintiffs' expert, Steven Carlson, for a number of appropriate reasons, including his lack of training and education, the inconsistency of his methods with generally accepted methods of business valuation, and miscalculations.

Piccerelli, whose testimony the district court accepted, testified to a fair market value of $303 for a single share of non-voting company stock in May 1996. He defined fair market value as the amount at which property would change hands between a willing seller and a willing buyer when neither is acting under compulsion and when both have knowledge of the relevant facts. He acknowledged that there were different methodologies available and was cross-examined on his choice. He was also cross-examined on his experience with valuing companies and on the total value he assigned the company for May 1996 of $6,800,000. Piccerelli was asked about whether the Van Leer sale undermined his confidence in the numbers, and he said it did not.

Using different figures, both sides' experts said two discounts had to be taken into account in valuing a single share of the company in May 1996: a marketability discount and a minority

"mere possibility" of a sale had been disclosed, on the assumption that any sale would be a strategic sale. This topic was not directly addressed by the evidence and there is no finding on the point.

discount.  By definition, a sale of an entire company will not involve any minority share or marketability discount, further undercutting the district court's assumption of equivalence between the May 1996 and September 1997 values.[12]  There is a notable absence of expert or other evidence in support of any assumption that the "mere possibility" of sale would have increased the fair market value in May 1996 by adding a premium.  We discuss the premium issue further below.

      b.     <u>Avoidance of Windfall to Wrongdoer and Award of Defendants' Profits</u>

There is another possible theory of recovery, first articulated in this court in <u>Janigan</u>: awarding plaintiffs whatever profits the fraudulent buyers made on resale of the stock in order to avoid unjust enrichment.  344 F.2d at 786-87; <u>see</u> 3 A.R. Bloomberg & L.D. Lowenfels, <u>Securities Fraud & Commodities Fraud</u> § 9.1 (2d ed. 2002).  The rule is based on equity and the principle that it is "more appropriate to give the defrauded party the benefit even of windfalls than to let the fraudulent party keep them."  <u>Janigan</u>, 344 F.2d at 786.  Under the Securities Act the Supreme Court has held, citing <u>Janigan</u>, that "where the defendant received more than the seller's actual loss . . . damages are the amount of the defendant's profit."  <u>Affiliated Ute</u>, 406 U.S. at

---

[12] Further undercutting the equivalence theory is the district court's finding in the companion <u>Kiepler</u> case that the company's "long-term success was far from assured because it faced increased competition from much larger companies."

"This alternative standard aims at preventing the unjust enrichment of a fraudulent buyer and it clearly does more than simply make the plaintiff whole for the economic loss proximately caused by the buyer's fraud." Randall v. Loftsgaarden, 478 U.S. 647, 663 (1986).

We believe that Rhode Island would adopt a similar equitable remedial rule of avoiding unjust enrichment for redemption of minority shareholders' stock involving a breach of fiduciary duty by corporate officers who are majority shareholders in close corporations. Indeed, equitable principles are routinely applied to remedies for breach of fiduciary duty.

Under Rhode Island law, a court's equitable power to award unjust enrichment damages is sometimes wielded under the rubric of the constructive trust. "A constructive trust will be imposed upon property that is obtained in violation of a fiduciary duty." Simpson v. Dailey, 496 A.2d 126, 128 (R.I. 1985). "The underlying principle of a constructive trust is the equitable prevention of unjust enrichment of one party at the expense of another in situations in which legal title to property was obtained . . . in violation of a fiduciary or confidential relationship . . . ." Id. While often used to grant the plaintiff legal title to real property, see, e.g., Matarese, 305 A.2d at 119, the

constructive trust can also be used to convey proceeds or other liquid assets, see Simpson, 496 A.2d at 127.[13]

But there is need for a great deal of caution. The fiduciary label means different things in different contexts. Officers and directors of a close corporation are not wholly comparable to trustees entrusted with the assets of minor wards, and unjust enrichment may not be an appropriate remedy here. The law of remedies as to the latter situation may not be entirely appropriate for the former. And the answer to the question of what are to be counted as "windfall profits" is far from clear from the record in this case. Rhode Island law discourages the award of speculative profits. See MacGregor, 60 A. at 762. Further, it is a general principle of equity "that the courts impose the least drastic remedy available to achieve the desired goals." See J.R.

---

[13] Rhode Island law elevates the standard of proof of liability to clear and convincing evidence before a constructive trust may be imposed. Under Rhode Island law, "parties requesting the imposition of a constructive trust must establish by clear and convincing evidence the existence of fraud or breach of a fiduciary duty; absent such proof there can be no constructive trust." Curato v. Brain, 715 A.2d 631, 634 (R.I. 1998); see Clark v. Bowler, 623 A.2d 27, 29 (R.I. 1993); Desnoyers v. Met. Life Ins. Co., 272 A.2d 683, 690 (R.I. 1971).

In our view, a damages theory based on avoidance of unjust enrichment is not identical to the law on creation of a constructive trust. Nevertheless, a constructive trust damages theory is an option the district court may consider. If damages under Rhode Island law are to be based on a constructive trust theory, then evidence of the nature of the fiduciary duty and the fact of the breach of that duty must be clear and convincing.

Farrand, Ancillary Remedies in SEC Civil Enforcement Suits, 89 Harv. L. Rev. 1779, 1813 (1976).

The district court did not independently analyze the Janigan avoidance of unjust enrichment theory of damages. Rather, based on its earlier error as to the value of plaintiffs' shares as of May 1996, it said, "That loss is identical to the profit realized by the defendants," and "the amount recoverable as damages is the same as the amount that the defendants would be required to disgorge."

There is little circuit law on the issue of how to approach a Janigan award based on the avoidance of unjust enrichment. Commentators have noted the confusion about damages in securities actions; a recent article by the authors of a leading treatise on securities law is entitled Compensatory Damages in Rule 10b-5 Actions: Pragmatic Justice or Chaos. L.D. Lowenfels & A.R. Bloomberg, 30 Seton Hall L. Rev. 1083 (2000).[14] This has been called a confused area of law where the courts, forced to rely on their wits, have crafted a myriad of approaches. See DCD Programs, Ltd. v. Leighton, 90 F.3d 1442, 1446 (9th Cir. 1996).

In equity, the correct legal standards interact with the underlying facts in determining an appropriate remedy. We think

---

[14] Another, by Michael Kaufman, is entitled No Foul, No Harm: The Real Measure of Damages Under Rule 10b-5, 39 Cath. U. L. Rev. 29 (1989)(arguing that damages should measure the relative materiality of the non-disclosed information).

the wiser course is to remand the matter of this theory of damages for such further proceedings as are warranted. In doing so we set some general parameters, cautioning that this is not an area where hard and fast rules are either easy to articulate or warranted.

To be clear, Janigan does not embody a rule that plaintiffs are automatically entitled to all of defendants' profits from defendants' subsequent resale of stock regardless of circumstance. Janigan itself does not state a per se rule that all subsequent profits accrue to plaintiffs; it is subject to significant restrictions which were not considered here. Janigan built upon an earlier case which stressed that "the particular circumstances surrounding the case" must be taken into account. Myzel v. Fields, 386 F.2d 718, 749 (8th Cir. 1967).

Janigan itself recognized at least two limits. First, it referred only to the profit which was "the proximate consequence of the fraud," itself a limiting factor. This court, sitting en banc, limited the application of the Janigan rule in the context of publicly traded companies. SEC v. MacDonald, 699 F.2d 47 (1st Cir. 1983). MacDonald held that the SEC could not recover, on a disgorgement of profits theory, the defendants' profits from use of insider information for a period beyond a reasonable time after public dissemination of the information. This was so, we held, because "when a seller of publicly traded securities has learned of previously undisclosed material facts, and decides nevertheless not

-37-

to replace the sold securities, he cannot later claim that his failure to obtain subsequent stock appreciation was a <u>proximate consequence</u> of his prior ignorance." <u>Id</u>. at 53 (emphasis added). Here, we have a close corporation; the plaintiffs lacked the opportunity, available to public shareholders, to reenter the market. Rather, <u>MacDonald</u> is significant, for our purposes, for its emphasis on the need for the wrongful profits to be "causally related" to the breach of duty. <u>Id</u>. at 54.[15] <u>MacDonald</u> also holds that the purpose of <u>Janigan</u>-type recovery is remedial, not punitive. <u>Id</u>.[16]

Second, <u>Janigan</u> said that extraordinary gains in a company's affairs attributable to extra efforts by defendants are not part of the windfall profits. <u>See</u> 344 F.2d at 787. "[A] subsequent increase in the value of the stock attributable to special or unique efforts of the fraudulent party other than those for which he is duly compensated" is not a windfall subject to disgorgement. <u>Nelson</u> v. <u>Serwold</u>, 576 F.2d 1332, 1338 n.3 (9th Cir. 1978); <u>see</u> <u>Siebel</u>, 725 F.2d at 1002.

---

[15] As one treatise has noted, the <u>Janigan</u> rule has particular strength when it is used for a close corporation: "[U]nlike the publicly traded situation, the plaintiff does not have the alternative of covering by going into the market and purchasing the security after becoming aware of the fraud." 3C H.S. Bloomenthal & S. Wolff, <u>Securities and Federal Corporate Law</u> § 13:44 (2d ed. 1999).

[16] We have no reason to think Rhode Island would permit the measure of damages to be punitive rather than remedial.

As the Janigan doctrine has been refined, recovery of the defendants' later profits is usually applied when the subsequent resale follows fairly closely the original purchase from the plaintiffs. See, e.g., Pidcock v. Sunnyland Am., Inc., 854 F.2d 443 (11th Cir. 1988) (company put up for sale in the same month in which the agreement for a fraudulent purchase was signed); Siebel, 725 F.2d at 1001 ("[A] defendant's profits may be disgorged where he fraudulently induces the plaintiff to sell securities to him and resells them shortly thereafter at a higher price . . . .") (emphasis added).[17]  "The mere passage of time, if long enough, may limit the amount of profits recoverable by a previously defrauded seller."  Pidcock, 854 F.2d at 447; see also Gerstle v. Gamble-Skogmo, Inc., 478 F.2d 1281, 1306 (2d Cir. 1973) ("The passage of time introduces so many elements . . . that extreme prolongation of the period [9 years] for calculating damages may be grossly unfair.").  In situations where the period of time was short and the defendants thus had more reason to be aware of a possible sale, the dangers of a speculative award are small.  The length of time between the repurchase of stock and the eventual sale of the company here falls at neither extreme of this temporal continuum,

---

[17] It is true that Janigan awarded profits from a sale two years later.  But there are differences between Janigan and the present case.  For example, in Janigan, the difference between the true market value of the stock at the time of the sale and its sale price was negligible; here it was not, and plaintiffs will receive real damages in any event.

and the district court is best positioned to make specific findings as to the effect, if any, of the passage of time.

Here there are a great many unanswered and perhaps unanswerable questions. For example, would defendants have tendered more than $200 a share upon disclosing the material information to plaintiffs? Would plaintiffs have accepted a higher tender, say, at $303 a share? Would defendants have offered that much? Would plaintiffs have held onto their shares in any of these scenarios? Is it fair to reward plaintiffs with the fruits of all profits given the risks defendants undertook in their subsequent management? Can any of these factors be quantified in some sense?[18]

The district court should also consider whether the case is appropriate for application of a Janigan approach which deems a defendant's later profits from sale of a company to be unjust enrichment. Other models of equitable relief may be better suited for the facts of this case, if equitable relief is warranted at all. If the evidence shows that the plaintiffs would have sold their shares even had they received the withheld information, then "any profit [defendants] earned above the premium [they] would have paid the [plaintiffs] absent the fraud is not unjust enrichment."

---

[18] The Seventh Circuit has used the model of assessing the probabilities of a series of events (e.g., of a possible sale, of a possible strategic sale, of plaintiffs holding on to their stock until time of sale) and discounting the sale price for these and other variables. See Jordan, 815 F.2d at 442. Even there, the court required a showing that the plaintiff would have retained stock ownership if full disclosure had been made. Id.

Rowe v. Maremont Corp., 850 F.2d 1226, 1241 (7th Cir. 1988). Moreover, it may be that the stock's sale price in September 1997 is so untethered to the stock's fair value in May 1996 that equitable relief is inappropriate. See Holmes, 583 F.2d at 563-64.

Another approach may be to rely not on what the fair market price was at the time of sale, but on the premium plaintiffs would have exacted from defendants were the relevant information disclosed. See Rowe, 850 F.2d at 1243. This solution would award plaintiffs more than their loss, strictly speaking, while not requiring the disgorgement of all of defendants' eventual profit, some of which may have been justly earned. (We recognize that this solution may be more akin to the first damages rationale discussed above.) In the effort to avoid giving wrongdoers a windfall, there must be attention to what the windfall really is. Because of the ambiguity about the meaning of the finding of the district court that the fair market value of the shares was $303, and whether that figure included a premium for a possible sale, this approach may or may not be an appropriate model.

Part of what complicates this case is that there was a series of material omissions or misstatements, and the different categories of breach may produce different remedial results. See Sharp v. Coopers & Lybrand, 649 F.2d 175, 191 (3d Cir. 1981). The district court should make such findings as are necessary and

-41-

fashion a remedy accordingly which does not give windfalls to defendants and which remedies the real harm to plaintiffs.

In any event, the floor of the damages plaintiffs will receive is the difference between the $200 and $303 a share on their percentage of ownership of the company in May 1996. We take no view as to which of the damages options are best suited to this case.

## 2. Application of Damages Theory

If the district court does choose to apply a damages award grounded in unjust enrichment theory, some close questions arise concerning how to calculate the defendants' profit, and the plaintiffs' share of that profit. First, the district court made a series of calculations concerning the percentage of ownership by both sides at various times, most of which either defendants or plaintiffs contest.[19]

Second, defendants rightly complain that the district court's calculation of the sale price of the company was incorrect. The price paid by Van Leer was $25,761,021, but defendants were required to pay $1,042,400 for the promissory notes they signed when they purchased the treasury shares on June 25, 1996. When calculating the September 1997 purchase price of the company, the

---

[19] Perhaps these controversies could effectively be bypassed if the district court were to simply use the various ownership percentages as of the time just before redemption of the plaintiffs' stock in May 1996.

total purchase price of the stock should be reduced by that sum to reflect the fact that Van Leer, in effect, received an immediate refund of over a million dollars upon purchase of the company.

Third, defendants argue that the district court abused its discretion in awarding prejudgment interest calculated from May 30, 1996, the date the plaintiffs agreed to sell their stock, and not from the purchase of the company sixteen months later. Prejudgment interest is meant to compensate plaintiffs for their "inability to utilize funds rightly due" them. R.I. Tpk. & Bridge Auth. v. Bethlehem Steel Corp., 446 A.2d 752, 757 (R.I. 1982). It must be calculated on the date the damages begin to accrue, even if a cause of action accrues earlier for other purposes. Blue Ribbon Beef Co. v. Napolitano, 696 A.2d 1225, 1230-31 (R.I. 1997). Otherwise, the plaintiffs would be compensated for more than "waiting for recompense to which they were legally entitled." Martin v. Lumbermen's Mut. Cas. Co., 559 A.2d 1028, 1031 (R.I. 1989).

We need not address whether the district court abused its discretion in awarding interest from May 1996 when its damages award was predicated, at least in part, on the theory that plaintiffs would not have sold their stock until September 1997. We caution only that the date prejudgment interest is awarded must comport with the theory of damages.

C.  Options

The plaintiffs also appeal the district court's denial of their challenge to the individual defendants' granting of options to themselves.  This was a separate claim from that involving the repurchase of plaintiffs' shares by the company.

The district court held that any claim as to options was a derivative claim not available to plaintiffs to assert in a direct action.  We find no error.  The usual rule is that an action grounded in an injury to a corporation must be brought as a derivative suit.  Vincel v. White Motor Corp., 521 F.2d 1113, 1118 (2d Cir. 1975); Halliwell Assocs. v. C.E. Maguire Servs., Inc., 586 A.2d 530, 533 (R.I. 1991).  If, however, the injury is the result of a violation of a duty owed directly to shareholders, they may sue on their own behalf.  "Where the act complained of creates not only a cause of action in favor of the corporation but also creates a cause of action in favor of the stockholder, as an individual, for violation of a duty owing directly to him, the stockholder may bring suit as an individual."  Empire Life Ins. Co. v. Valdak Corp., 468 F.2d 330, 335 (5th Cir. 1972) (emphasis in original).  In order to pursue a derivative suit, plaintiffs must allege that all other avenues of redress are foreclosed, including redress by the board of directors.  See R.I. Super. Ct. R. Civ. P. 23.1 (defining the requirements for shareholder derivative suits);

<u>Hendrick</u> v. <u>Hendrick</u>, 755 A.2d 784, 794 (R.I. 2000) (closely held corporation).

A challenge to the granting of options to executives usually requires a derivative suit. <u>See</u> <u>In re Triarc Cos.</u>, 791 A.2d 872, 878 (Del. Ch. 2001) (rejecting a direct claim of fiduciary breach based on the granting of options to corporate executives in a public corporation). This is because if the option price is too low, the corporation as a whole suffers, because it will not receive a fair price when the options are exercised. The fact that the option price was too low because the defendants may have known something improperly withheld from the plaintiffs does not transform this suit into one which may be brought directly. The context of a closely held corporation does not change this analysis. <u>See</u> <u>Hendrick</u>, 755 A.2d at 793-94 (requiring a derivative action to challenge executive compensation in a closely held corporation); <u>accord</u> <u>Symmons</u> v. <u>O'Keeffe</u>, 644 N.E.2d 631, 638 (Mass. 1995) (same); <u>Bessette</u> v. <u>Bessette</u>, 434 N.E.2d 206, 208 (Mass. 1982).

Plaintiffs argue that a direct cause of action should be available because the individual defendants are also stockholders, so that they would benefit from a derivative action on behalf of all stockholders. This argument proves too much. Many, if not most, corporate executives are stockholders in the companies they represent. To establish an exception that would allow direct suits

any time they named executives who were also stockholders would eviscerate the derivative suit requirement.

We affirm the district court's dismissal of the plaintiffs' claim against the granting of options.

D. Conclusion

Disputes among next generations in family-owned small companies are not infrequent. Sometimes, as here, the disputes lead to litigation. The parties now have what may be their last opportunity to reach an agreement. We hope they will seize it.

We affirm the holding that defendants were in breach of their duties under Rhode Island law to the plaintiff minority shareholders in their redemption of plaintiffs' shares in May 1996. We also hold that the measure of the fair market value as of May 1996 is determined: the plaintiffs would be entitled to the difference per share between $303 and $200 (subject to the proviso stated before). The measure of the damages tied to preventing unjust enrichment to defendants is not determined, nor is the issue of whether that measure is the appropriate yardstick under equitable principles to use given the facts of this case. The case is remanded for further proceedings. The district court, in its discretion, may take such additional evidence as it deems necessary to enable it to make the necessary findings. Each side shall bear its own costs.

<u>Lawton</u> v. <u>Nyman</u>

Chronology

1936                Nyman Manufacturing founded by John Nyman.

late 1980s          Robert and Kenneth Nyman inherited all Class B
                    voting shares and became president and vice-
                    president and members of the board of directors.

early 1990s         Nyman Manufacturing lost money.

by 1994             Nyman Manufacturing on verge of bankruptcy.
                    Robert and Kenneth personally guaranteed $1
                    million loan and reduced their salaries and
                    benefits.

August 1994         Nyman Manufacturing hired Keith Johnson as CFO
                    and Treasurer.

early 1995          Nyman Manufacturing doing better; Board adopted
                    stock option and buy-back plans.

April 3, 1995       Board granted Johnson option to buy 1,000 Class A
                    shares at 80 percent of book value,
                    $145.36/share.

late 1995           Fleet Bank terminated relationship with Nyman
                    Manufacturing; Johnson obtained new financing
                    from other institutions.

November 6, 1995    Board redeemed the 2,256 Class A shares owned by
                    the estate of Magda Burt for $145.36/share.
                    Robert, Kenneth and Johnson ("the Defendants")
                    received options to buy 2,256 shares.

January 1996        Board offered to redeem 1,677 Class A shares
                    owned by the Walfred Nyman Trust for $145.36.
                    Offer rejected because of Beverly Kiepler's
                    resistance.

March 29, 1996      1996 fiscal year ended; Nyman Manufacturing
                    earned a $3.5 million profit but largely on non-
                    recurring items.

| | |
|---|---|
| April 1996 | Board voted the Defendants deferred compensation plans worth $2 million and decided to hire a consultant. |
| April-May 1996 | Johnson talks to Kiepler about possible redemption of her shares and tells her the bank waiver permitting possible redemption of her shares expires on May 1. This is untrue. |
| May 8, 1996 | Johnson mailed letter to stockholders offering $200/share buy-back. Letter doesn't mention possibility that company could be sold. |
| May 10, 1996 | Robert called Judith Lawton; described opportunity to sell as "once in a lifetime"; did not mention possibility company might be sold. |
| May 30, 1996 | The Lawtons sold their 952 Class A shares for $200/share. The children of Robert and Kenneth also sold 140 Class A shares. |
| June 25, 1996 | The Defendants voted themselves options to buy 1,092 shares at $200/share to $220/share. The Defendants also bought all available treasury shares (4,115 Class A shares and 750 Class B shares) for $200/share. The book value of the company's shares is $527.50/share. |
| August 1996 | The Defendants met with Shields & Co. to discuss the possible sale of the company and other issues. |
| October 1996 | Johnson identified the Van Leer Corp. to Thomas Shields as a possible acquirer. |
| November 1996 | Shields sent Johnson a letter identifying the "universe of potential buyers in the next three years." |
| March 1997 | Johnson met with Van Leer executives in the Netherlands to discuss sale of Nyman Manufacturing or joint venture. |
| June 25, 1997 | Letter of intent signed providing that Van Leer will buy all outstanding Nyman Manufacturing stock. |

September 29, 1997 Closing for Van Leer purchase of Nyman
                 Manufacturing.  Van Leer paid $1,667.38 per
                 Class A share and $2,167.59 per Class B share.

May 22, 1998     Complaint filed in Lawton v. Nyman.

January 17, 2002 District  court  decided  Lawton  v. Nyman  and
                 Kiepler v. Nyman.

July 2, 2002     Kiepler appeal dismissed at parties' behest.